895 F.2d 780
 282 U.S.App.D.C. 375
 WESTERN FUELS-UTAH, INC., Appellant,
v.
Manuel LUJAN, Jr., Secretary of the United States Department
of the Interior, Appellee.
PEABODY COAL COMPANY, et al., Appellants,
v.
Manuel LUJAN, Jr., Secretary of the United States Department
of the Interior, Appellee.
COLOWYO COAL COMPANY, Appellant,
v.
Manuel LUJAN, Jr., Secretary of the United States Department
of the Interior, Appellee.
 Nos. 88-5417 through 88-5419.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 12, 1989.
Decided Feb. 9, 1990.
 
 John F. Shepherd, Denver, Colo., with whom Kenneth D. Hubbard, Washington, D.C., for Peabody Coal Co., et al., Charles L. Kaiser, Denver, Colo., and Thomas P. Humphrey, Washington, D.C., for Colowyo Coal Co. were on the joint brief for appellants, in Nos. 88-5418 and 88-5419.
 Charles F. Holum, Denver, Colo., with whom Edward Weinberg, Washington, D.C., was on the brief for appellant, Western Fuels-Utah, Inc. in No. 88-5417.
 Jean A. Kingrey, Atty., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen. and Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellee in all cases.
 William L. Slover and John H. LeSeur for City of Colorado Springs, Colo., and Central Power & Light Co., Kenneth G. Lee, Washington, D.C., for Colorado-Ute Electric Ass'n, Inc., were on the joint brief for amici curiae urging reversal in all cases.
 John R. McNeill and J. David Reed, Montrose, Colo., also entered appearances for amici curiae, Colorado-Ute Elec. Ass'n, Inc., in No. 88-5419.
 Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Chief Judge WALD.
 WALD, Chief Judge:
 
 
 1
 The appellants in these consolidated cases hold leases granting them the right to mine coal on federal lands. They seek review of the district court's decision upholding the Bureau of Land Management's ("BLM") readjustments of their leases. The appellants challenge first the BLM's decision that it was compelled to apply the Federal Coal Leasing Amendments Act of 1976 ("FCLAA") to their leases, even though the leases were issued before 1976, and claim further that if the BLM has correctly interpreted FCLAA to apply to their leases, then the statute is unconstitutional. The appellants also challenge the timeliness of the lease readjustments. We affirm the district court's judgment sustaining the lease readjustments against all of these claims.
 
 I. BACKGROUND
 
 2
 The Mineral Lands Leasing Act of 1920 ("MLLA"), 41 Stat. 437 (1920) (codified as amended at 30 U.S.C. Secs. 181-287), authorized the Secretary of the Interior to lease federal lands for coal production. The Act dictated certain mandatory provisions to be included in the leases it authorized; in particular, it required that each lease provide for payment by the lessee of a royalty of not less than five cents per ton of coal extracted. Sec. 7, 41 Stat. at 439. The Act provided that the term of a coal mining lease would be indeterminate, upon condition of diligent development and continued operation of the mine, and upon the further condition that "at the end of each twenty-year period succeeding the date of the lease such readjustment of terms and conditions may be made as the Secretary of the Interior may determine, unless otherwise provided by law at the time of the expiration of such periods." Id.
 
 
 3
 In 1976, Congress enacted the Federal Coal Leasing Amendments Act of 1976, 90 Stat. 1083 (1976) (codified as amended at scattered sections of 30 U.S.C.). Among the several concerns that led Congress to amend the MLLA was the low royalty lessees were paying for publicly owned coal. See H.R.Rep. No. 681, 94th Cong., 2d Sess. 17, reprinted in 1976 U.S.Code Cong. & Admin.News 1943, 1953 [hereinafter 1976 House Report] ("the public is being paid a pittance for its coal resources"). Accordingly, Congress amended Sec. 7 of the MLLA, 30 U.S.C. Sec. 207, to provide:
 
 
 4
 A coal lease shall be for a term of twenty years and for so long thereafter as coal is produced annually in commercial quantities from that lease.... A lease shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12 1/2 per centum of the value of coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations. The lease shall include such other terms and conditions as the Secretary shall determine. Such rentals and royalties and other terms and conditions of the lease will be subject to readjustment at the end of its primary term of twenty years and at the end of each ten-year period thereafter if the lease is extended.
 
 
 5
 The appellants, Peabody Coal Company ("Peabody"), Colowyo Coal Company ("Colowyo"), and Western Fuels-Utah, Inc. ("Western Fuels"), are holders of federal coal leases issued before 1976. Each lease, in accordance with the MLLA, contained a clause reserving to the lessor a right of readjustment at twenty-year intervals. These clauses did not precisely track the words of the statute; they provided that the lessor reserved:
 
 
 6
 [t]he right reasonably to readjust and fix royalties payable hereunder and other terms and conditions at the end of 20 years from the date hereof and thereafter at the end of each succeeding 20-year period during the continuance of this lease unless otherwise provided by law at the time of the expiration of any such period.
 
 
 7
 See Joint Appendix ("J.A.") 12, 36, 41, 75, 203.[1]
 
 
 8
 As the leases came due for their twenty-year readjustments after 1976, the Secretary, acting through the BLM, readjusted them to provide for payment of the 12.5% royalty fixed in Sec. 207 (except in the case of Western Fuels' lease, for which a lower royalty was fixed because Western Fuels engages in underground mining), and also to provide that their subsequent readjustments would take place at ten-year intervals. The BLM expressly stated at the time of these readjustments (and continues to maintain on this appeal) that it used the 12.5% royalty figure because Sec. 207 required it to do so. See, e.g., J.A. 26; Brief for Appellee at 21-22. The lessees, except Western Fuels, objected to the 12.5% royalty, but the BLM overruled these objections.
 
 
 9
 The lessees also objected to the timeliness of the procedure by which the BLM readjusted their leases. At the time of the lease readjustments in question, the BLM used a four-step process to readjust coal leases. The first step was that the BLM sent the lessee a Notice of Intent to Readjust the Lease ("NIRL").[2] This notice, a one-page letter, stated the date on which the lease became subject to readjustment; it also stated that the lease would be readjusted, and that the readjusted terms and conditions would be sent to the lessee within two years of the date of the NIRL. See, e.g., J.A. 49. The second step was that the BLM sent the lessee the proposed readjusted terms and conditions of the lease. The third step was that the lessee could file objections to the proposed terms with the BLM. The last step was the BLM's ruling on the lessee's objections and imposition of the readjusted lease.
 
 
 10
 In all of the lease readjustments at issue, the BLM sent the lessee a NIRL prior to the lease's twenty-year anniversary date. The lease readjustment process, however, was not completed before the anniversary date in all of the cases. In the case of Western Fuels' lease, the BLM did not send the proposed readjusted terms until after the anniversary date. In all of the other cases, the BLM sent the NIRL and the proposed readjusted terms before the anniversary date, but with regard to some of the leases, the BLM did not rule on the lessee's objections to the proposed readjusted terms until after the anniversary date. In all the cases, the BLM sent the proposed readjusted terms within the period specified in the NIRL.
 
 
 11
 The lessees all appealed their readjustments within the Department of the Interior to the Interior Board of Land Appeals ("IBLA"), which upheld the mandatory application of Sec. 207 to pre-1976 leases,[3] and found the lease readjustments to be timely. The lessees sought review of the IBLA decisions in district court, which consolidated the cases and granted the Secretary's motion for summary judgment in all of them. The lessees then brought the instant appeals.
 
 
 12
 II. THE APPLICABILITY OF SECTION 207 TO PRE-1976 LEASES
 
 
 13
 In deciding whether to uphold the BLM's decision to apply Sec. 207 to pre-1976 leases, we begin by identifying the precise question at issue, and determining whether Congress has directly spoken to that question. If the intent of Congress with respect to the precise question at issue is clear, we must give it effect. Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). In determining the intent of Congress, we must look to "the particular statutory language at issue, as well as the language and design of the statute as a whole," K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), and we must employ traditional tools of statutory construction, including, where appropriate, legislative history. Ohio v. United States Department of the Interior, 880 F.2d 432, 441 (D.C.Cir.1989).
 
 
 14
 In the present cases, the question at issue is whether the mandatory lease terms provided in Sec. 207 apply to pre-1976 leases when they come up for readjustment after 1976. The text of Sec. 207 itself does not clearly answer that question. As amended by FCLAA, 30 U.S.C. Sec. 207 now provides in mandatory terms for a 12.5% royalty on coal leases. It does not, however, expressly provide that this royalty shall be imposed on pre-1976 leases; nor, on the other hand, does it expressly grandfather such leases from the imposition of this royalty.
 
 
 15
 The appellants claim that the absence of an express reference to pre-1976 leases in Sec. 207 implies that such leases are exempt from the section's new, mandatory lease terms. The appellants observe that in other places, FCLAA makes express reference to pre-1976 leases, thereby suggesting that Congress knows how to refer to such leases when it wants to affect them. However, one might equally well observe that when Congress wants to exempt existing arrangements from new statutory requirements, it knows how to include a grandfather clause. Indeed, one of FCLAA's express references to pre-1976 leases is in the nature of an exemption of such leases from certain of FCLAA's new, more exacting requirements.[4] If we were to draw any inference from this explicit reference, it would be that in the absence of such a reference in Sec. 207, pre-1976 leases are not exempted from that section's requirements.
 
 
 16
 The government, by contrast, notes that FCLAA superseded that part of the MLLA that specified the mandatory royalty provisions of pre-1976 leases; the earlier royalty provision is no longer in the Act. Therefore, if the mandatory terms of FCLAA do not apply to pre-1976 leases, such leases would be subject to no mandatory royalty at all upon readjustment. Hence, the government concludes, the absence of any special reference to pre-1976 leases in FCLAA implies that the new terms of FCLAA must apply to them. This argument, too, is not preemptive; Congress could simply have trusted the Secretary to determine an appropriate royalty for pre-1976 leases without the guidance of a statutory minimum, just as there now is apparently no statutory minimum royalty for coal recovered by underground mining operations. The absence of a specific reference to pre-1976 leases in the new Sec. 207 does not definitively decide the issue.
 
 
 17
 The appellants also observe that the new Sec. 207 speaks of the "primary term of twenty years" of a coal lease. Pre-1976 leases, the appellants correctly observe, have no primary term, but are indefinite. However, we do not conclude from this that Sec. 207 cannot apply to pre-1976 leases. As we shall see below,[5] Congress sometimes uses the word "term" to refer to the first twenty-year period in the life of a pre-1976 coal lease, even though, technically speaking, such leases are for an indefinite term. We think the phrase "primary term of twenty years" simply means the twenty-year period before a coal lease first becomes subject to readjustment, whether the lease was issued before or after 1976. Ultimately, therefore, the text of Sec. 207 does not unambiguously answer the question of whether Congress intended FCLAA's new mandatory lease terms to apply to pre-1976 leases.
 
 
 18
 This is not, however, the end of the initial Chevron inquiry; we now turn to "the language and design of the statute as a whole," see K Mart, 108 S.Ct. at 1817, to determine whether Congress expressed its intent on the question at issue. Looking outside Sec. 207 to other sections of the statute, we find convincing evidence of Sec. 207's scope.
 
 
 19
 30 U.S.C. Sec. 203 allows holders of coal leases to modify their leases by adding contiguous or cornering lands to them. Such a modification creates a new lease, and if all lands covered by the new lease were immediately subject to the royalty provision of Sec. 207, holders of pre-1976 leases would be understandably reluctant to add land to their leases. Section 203 therefore provides
 
 
 20
 The minimum royalty provisions of section 207(a) of this title shall not apply to any lands covered by this modified lease prior to a modification until the term of the original lease or extension thereof which became effective prior to the effective date of this Act has expired.[6]
 
 
 21
 We find it impossible to make sense out of Sec. 203 unless Sec. 207 applies to pre-1976 leases. The quoted sentence clearly suggests that Sec. 207's royalty provision will become applicable to all the lands in a modified lease at some time after the modification. The sentence must refer to a lease originally issued before 1976 but modified thereafter, for if a lease was originally issued after 1976, Sec. 207 immediately applied to all of it. In providing that Sec. 207 would apply to the lands covered by the original lease only after the original term or an extension thereof expires, Sec. 203 necessarily assumes the application of Sec. 207 to the pre-1976 lease at the readjustment date. Section 203 thus shows that the new mandatory lease terms apply to lands covered by a pre-1976 lease upon readjustment.[7]
 
 
 22
 The legislative history of Sec. 203 confirms this reading.[8] The Senate Report states, "[a]ll leases would of course be subject to the provisions of the 1976 amendments at the expiration of their original lease term. [Section 203] does not affect this eventuality in any way." S.Rep. No. 1169, 95th Cong., 2d Sess. 7 (1978), 1978 U.S.Code Cong. & Admin.News 4736, 4740. Senator Melcher, a member of the Senate subcommittee responsible for the 1978 amendment to Sec. 203, stated during the debates on the bill that "[t]he effect of the bill passed in 1976 was that, as [outstanding coal] leases became renewable at the end of 20 years, the terms of the lease would be changed to 12.5 percent royalty." 124 Cong.Rec. 30,369 (1978). Senator Haskell, chairman of the subcommittee, agreed. Id. Section 203 thus provides conclusive support for the Secretary's interpretation of Sec. 207.
 
 
 23
 The appellants argue that when Congress was considering the 1978 amendment to Sec. 203, it considered and rejected a floor amendment that would have amended the MLLA to provide expressly that pre-1976 leases would be subject to FCLAA's mandatory royalty rates upon readjustment. From the failure of Congress to enact this amendment, the appellants would have us conclude that Congress is at odds with the Secretary's interpretation of FCLAA. However, we are not convinced. In the first place, we think the appellants have misapprehended the purpose of the proposed amendment. It principally concerned those pre-1976 leases that had come due for readjustment but that the Secretary had for some reason failed to readjust. The proposed amendment would have automatically subjected such leases to the 12.5% royalty. See 124 Cong.Rec. 30,369. The failure of Congress to impose the 12.5% royalty on leases for which readjustment had been waived does not establish any intent as to what the Secretary must do when he actually readjusted a lease; at most it suggests a reluctance to impose new terms on a lease once the time for readjustment has passed.
 
 
 24
 Moreover, even if the appellants were correct in saying that the purpose of the proposed amendment to the 1978 act was to codify the interpretation of FCLAA that the Secretary now espouses, its failure of passage does not mean that the Secretary's interpretation is wrong. The inference is just as natural that Congress believed the amendment was unnecessary because it simply restated existing law.[9] Drawing inferences from the failure of Congress to enact proposed legislation requires caution, see, e.g., Advanced Micro Devices v. Civil Aeronautics Board, 742 F.2d 1520, 1541-42 (D.C.Cir.1984), and we should certainly not give more weight to the failure of Congress to enact the floor amendment than to the bill that Congress did enact, which, as discussed earlier, clearly shows that the Secretary's interpretation of Sec. 207 is correct.
 
 
 25
 The appellants also argue that the 1976 FCLAA must be read in light of the history of federal coal leasing since 1920, and that the 1976 Congress must be presumed not to have intended to change the scheme of long-term lease stability created by the 1920 Congress.[10] The 1920 Congress, appellants argue, knew that coal mining requires large capital expenditures that a mining company would not be willing to make if it could obtain fixed lease terms for only twenty years, and so it created the indeterminate lease. However, even assuming, without deciding, that the 1976 Congress did not intend to break promises of stability made by the 1920 Congress, we find no evidence that the 1920 Congress made any promise that would preclude a later Congress from regulating the royalty for coal leases.
 
 
 26
 The 1920 MLLA provided that "at the end of each twenty-year period succeeding the date of [a coal] lease such readjustment of terms and conditions may be made as the Secretary of the Interior may determine, unless otherwise provided by law at the time of the expiration of such periods." 41 Stat. at 439. The Act put no upper limit on the royalty rate the Secretary might set upon readjustment; hence, even without FCLAA the Secretary would have had the power (though not the obligation) to fix a rate of 12.5%. It is clear, therefore, that Congress never promised that coal lessees would not be subject to such a rate.
 
 
 27
 The appellants argue, however, that although under the 1920 Act the Secretary could choose such a rate, a subsequent Congress could not direct the Secretary's choice by law. Drawing on excerpts from the legislative history of the 1920 Act, the appellants claim that Congress decided permanently to lodge the authority to readjust royalty rates in the Secretary. The history cited by the appellants, however, shows no more than that Congress, in 1920, was faced with the ordinary choice between dictating certain rates by statute and leaving them to the discretion of an administrative official.[11] Congress delegated authority, within certain limits, to the Secretary, but retained, as usual, the power to circumscribe the Secretary's authority further at a later date. This is made doubly clear by the express provision in the 1920 Act that readjustments shall be as the Secretary may determine "unless otherwise provided by law," which brings us back full circle to the initial inquiry of what, if anything, the current law does provide as to pre-1976 leases. We see no reason, certainly, to think that the 1976 Congress felt any constraint against fixing a royalty rate of 12.5% for readjusted pre-1976 leases.
 
 
 28
 Finally, the appellants argue that it is not reasonable to conclude that Congress left the Secretary no discretion to impose a royalty rate of less than 12.5% on pre-1976 leases, because the 12.5% rate is simply too high in many cases. In this argument the appellants are joined by several amici curiae, who argue that the increased royalty rates will ultimately be borne by consumers of coal-generated power, and that the increase will be devastating and unfair to those power companies that built coal-fired generating facilities at great expense during the 1970's in response to the United States government's efforts to reduce the nation's dependency on foreign oil. The legislative history of FCLAA shows, however, that Congress was aware of this danger. Several members of the House Committee on Interior and Insular Affairs specifically warned the Congress that 12.5% was too high a figure, and that its imposition would result in higher consumer costs. See 1976 House Report at 57-58, 1976 U.S.Code Cong. & Admin.News at 1981. Congress passed FCLAA anyway, and it is therefore not unreasonable to attribute to Congress a desire to impose the 12.5% royalty rate despite its likely effect on fuel costs.
 
 
 29
 In sum, we think Sec. 203 clearly demonstrates that Congress intended Sec. 207's 12.5% royalty rate to apply to pre-1976 leases as they come up for readjustment.[12] Accordingly, we uphold the Secretary's determination that he is bound to apply Sec. 207's mandatory lease terms to pre-1976 leases.[13]
 
 
 30
 III. THE CONSTITUTIONALITY OF THE LEASE READJUSTMENTS
 
 A. Takings Clause
 
 31
 Appellants contend that if Sec. 207 does, in fact, require the Secretary to readjust their leases for a 12.5% percent royalty, then the Act unconstitutionally takes their property without just compensation. Alternately, they say, the possibility that the Secretary's construction of the Act may operate unconstitutionally on pre-1976 leases should militate in favor of a construction that avoids constitutional risk. We conclude that Sec. 207, as applied to the leases before us, does not violate the Constitution.
 
 
 32
 The Fifth Amendment to the Constitution provides that private property shall not be taken for public use without just compensation. The appellants claim that the Secretary's decision to impose a 12.5% royalty on all leases substantially interferes with their investment-backed expectation in an individualized determination by the Secretary on the proper royalty adjustment for each lease; the new royalty therefore amounts to an unconstitutional taking of property. Brief for Appellants Peabody and Colowyo at 41-42 (citing Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). While the appellants concede that their leases provide for readjustment at twenty-year intervals, they stress that most of the leases in question provide for reasonable readjustment. Such readjustments, they claim, can only be accomplished by individualized consideration of the particular circumstances surrounding each lease.
 
 
 33
 Most of the leases at issue provide that the lessor reserves
 
 
 34
 [t]he right reasonably to readjust and fix royalties payable hereunder and other terms and conditions at the end of 20 years from the date hereof and thereafter at the end of each succeeding 20-year period during the continuance of this lease unless otherwise provided by law at the time of the expiration of any such period.
 
 
 35
 The constitutional question is whether this clause provides the lessees with rights that can be considered "property" subject to the protections of the Takings Clause.
 
 
 36
 The readjustment clause ends with the phrase "unless otherwise provided by law at the time of the expiration of any such period." It is not immediately clear which part of the readjustment clause this phrase modifies. It might, on the other hand, modify only the phrase "and thereafter at the end of each succeeding 20-year period during the continuance of this lease," meaning that lease readjustments would take place every twenty years, unless Congress by law required them to take place at some other interval. It might, on the other hand, modify the whole of the clause that precedes it, which would presumably mean that the lessor reserves the right to readjust the lease, except that Congress may provide by law that there shall be no readjustment. It might modify the phrase "reasonably to readjust," and thus mean that the lessor reserves the right reasonably to readjust the lease, except that Congress may provide by law for a specific readjustment of its choosing, even one that would have been unreasonable for the Secretary to make on his own under the prior law.
 
 
 37
 In choosing among the possible meanings of the readjustment clauses before us, we think the crucial point is that some of the constructions would immunize the leases from the sovereign power of the United States to change its laws. Such constructions are highly disfavored. The Supreme Court recently reminded us that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52, 106 S.Ct. 2390, 2396-97, 91 L.Ed.2d 35 (1986). The Court stated that the federal government has the duty to honor contracts that confer vested rights on private parties, but observed that "contractual arrangements, including those to which a sovereign itself is party, remain subject to subsequent legislation by the sovereign," id. at 52, 106 S.Ct. at 2396-97 (internal quotation omitted), and that "contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority," id. at 52-53, 106 S.Ct. at 2396-97. See also Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 144-48, 102 S.Ct. 894, 905-07, 71 L.Ed.2d 21 (1982) (contract granting private party power to extract oil and gas from tribal land should not be construed to abrogate the tribe's sovereign power to impose a severance tax on extractions).
 
 
 38
 Applying this rule of construction to the lease contracts before us, we conclude that the leases reserve to Congress the power to provide by law for a specific readjustment.[14] The phrase "unless otherwise provided by law at the time of the expiration of any such period," though susceptible of multiple interpretations, is certainly susceptible of this one, which has the indisputable advantage of not foreclosing the exercise of sovereign authority. The leases here do not represent a surrender "in unmistakable terms" of Congress' power to change the law of federal coal leasing. Accordingly, we find that the pre-1976 leases did not give the lessees a vested right to reasonable readjustments by the Secretary on an individualized basis indefinitely into the future. A congressionally-mandated readjustment at the end of a twenty-year period therefore does not represent a taking of property in violation of the Takings Clause.
 
 
 39
 The lessees suggest that it would be inappropriate for this court, in construing the lease contracts, to defer to the interpretation of the readjustment clause suggested by the government, because it would, according to them, violate fundamental principles of contract law to let one party to a contract dictate its interpretation. We emphasize, therefore, that in construing the lease contracts we are not deferring to the BLM's interpretation. We are, rather, applying the rule of construction laid down by the Supreme Court, that one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that the contract confers such a right in unmistakable terms. We have no occasion in these cases to comment on whether it would be appropriate to defer to the government's interpretation of a contract between it and a private party, where the question of interpretation did not involve the limiting of the government's sovereign authority.
 
 B. Due Process
 
 40
 The appellants also claim that the imposition of a 12.5% royalty violates Due Process, on the ground that Congress had no basis on which it could find such a rate to be reasonable, as purportedly required by the leases. The appellants note that a congressional commission recently concluded that 12.5% is an excessive royalty rate for coal leases. Brief for Appellants Peabody and Colowyo at 40-41. This claim is meritless. Given our conclusion that Congress had the power to provide by law for such lease readjustments as it saw fit, we cannot strike down Congress' choice of a 12.5% rate simply because we might think it unwise or improvident. Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).
 
 
 41
 IV. THE TIMELINESS OF THE LEASE READJUSTMENTS
 
 
 42
 The MLLA and the leases in question provide that the leases may be readjusted "at the end" of each twenty-year period following their issuance. According to the appellants, the United States waives the right to readjust a lease unless it completes the readjustment prior to the anniversary date of the issuance of the lease. Appellants Peabody and Colowyo argue that a readjustment is not complete until the Secretary rules on the lessee's objections to proposed lease terms; appellant Western Fuels argues that a readjustment is certainly not complete until the Secretary sends the lessee the proposed lease terms. The Secretary argues that he may complete readjustment of a lease after the anniversary date provided he sends the lessee a Notice of Intent to Readjust the Lease ("NIRL") prior to the anniversary date, and sends the readjusted terms within the time specified in the NIRL.
 
 
 43
 Chevron again controls our decision. We conclude without difficulty that the Act does not clearly address the question of precisely when the Secretary must perform a lease readjustment. The appellants argue that "at the end" is a precise term and must be given its precise meaning. Brief for Appellant Western Fuels at 11. Their argument in essence is that the phrase "at the end" means "before the end." They offer no persuasive reason, however, why it should have that meaning, and they certainly do not convince us that it must have that meaning. To give the statutory phrase its literal meaning would be to say that the United States waives its ability to readjust a coal lease unless it performs the readjustment on the very day the lease expires, a result Congress could hardly have intended.
 
 
 44
 The statutory provision that a lease may be readjusted "at the end" of each 20-year period is capable of bearing other interpretations. It could mean, for instance, that negotiations concerning the new lease terms should begin on or about the anniversary date of the original lease. It could be intended to govern only the effective date of a readjusted lease, and to impose no requirements as to when the readjusted terms should be determined. In short, we think Congress implicitly delegated to the Secretary the task of determining the timing of the procedures by which he would readjust coal leases. See Chevron, 467 U.S. at 843-45, 104 S.Ct. at 2781-83.
 
 
 45
 We therefore inquire whether the Secretary's interpretation of the statute is reasonable and consistent with the statute's purpose. See id. We conclude that it is. The Secretary's procedure of sending a NIRL prior to the lease's anniversary date, and the proposed terms within a time specified in the NIRL, provides the lessee with what it legitimately needs: a date by which it can tell whether its lease will be readjusted. No lessee before us can claim that it was unfairly surprised by the lease readjustment, or that it took action in reliance on the legitimate belief that its lease would not be readjusted. We therefore conclude that the Secretary's procedure satisfied the timeliness requirements of the statute.[15]V. CONCLUSION
 
 
 46
 For the foregoing reasons, we find no infirmity in the BLM's readjustments of the appellants' coal mining leases. The judgment of the district court is accordingly
 
 
 47
 Affirmed.
 
 
 
 [1]
 One of the leases at issue contained slightly different wording. It provided:
 It is mutually understood and agreed that the lessor shall have the right to readjust and fix the royalties payable hereunder and other terms and conditions at the end of 20 years from the date hereof, and thereafter at the end of each succeeding 20-year period during the continuance of this lease unless otherwise provided by law at the time of the expiration of any such period.
 J.A. 165.
 
 
 [2]
 The terms used here to describe the steps in the BLM's procedure are not standardized BLM terms, but are simply used for clarity
 
 
 [3]
 The term "pre-1976" is used throughout this opinion as shorthand for "prior to August 4, 1976," the effective date of FCLAA
 
 
 [4]
 The reference is in Sec. 3 of FCLAA, 30 U.S.C. Sec. 201(a)(2)(A). This section was the result of the 1976 Congress' displeasure with federal coal lessees who were not mining coal, but who were holding onto coal leases for speculative purposes. See 1976 House Report at 14-15, 1976 U.S.Code Cong. & Admin.News at 1950-51. The section provides that the Secretary shall not issue a coal lease to any person who already holds one but who has not produced coal under that lease for a period of ten years. The section also provides, however, that in computing the ten-year period, the Secretary shall not count time prior to August 4, 1976
 
 
 [5]
 See infra note 7 and accompanying text
 
 
 [6]
 This sentence was not added to Sec. 203 until 1978. See 92 Stat. 2073, 2074 (1978). It is, however, now a part of the "statute as a whole" that we must interpret. We of course bear in mind "the oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " Consumer Product Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980) (quoting United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 331-32, 4 L.Ed.2d 334 (1960)). As CPSC v. GTE Sylvania explains, however, there is an important distinction between subsequent legislation and less formal types of subsequent legislative history. Id. at 118 n. 13, 100 S.Ct. at 2061 n. 13. It is proper for us to consider the new text of Sec. 203 in our attempts to discern the meaning of the 1976 amendment to Sec. 207; indeed, "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." Id. (quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969))
 
 
 [7]
 The section also shows that Congress on occasion referred to the first twenty-year period in the life of a pre-1976 coal lease as the "term" of that lease. As noted earlier, the term of a pre-1976 lease is, technically, indeterminate. But the word "term" cannot have that meaning in the quoted sentence from Sec. 203, because if it did, the section's statement that Sec. 207 does not apply "until the term of the original lease ... has expired" would be tantamount to saying that Sec. 207 would never apply, an interpretation of Sec. 203 that would be absurd to impute to Congress. Nor would it make sense to speak of an "extension" of the original lease, as section Sec. 203 does, if the original lease term were indeterminate. Section 203 therefore confirms our reading of the phrase "primary term of twenty years" in Sec. 207 as applying to pre-1976 leases
 
 
 [8]
 In keeping with CPSC v. GTE Sylvania, see supra, we have not given great weight to the legislative reports and floor statements accompanying the 1978 amendment to Sec. 203. They merely confirm what the text of Sec. 203 makes clear. But see Bell v. New Jersey, 461 U.S. 773, 784-86, 103 S.Ct. 2187, 2193-95, 76 L.Ed.2d 312 (1983) (giving "persuasive value," while interpreting a statute, to floor statements made during passage of a later amendment)
 
 
 [9]
 Indeed, a fuller history of the proposed floor amendment supports this probability. The Senate adopted the amendment and passed the bill as amended. 124 Cong.Rec. 30,372. The House passed a bill that was substantially identical to the Senate bill, except that (1) it treated differently the Secretary's authority to acquire existing leases by giving the lessees other lands in exchange, and (2) it did not contain the amendment adopted on the Senate floor. See id. at 33,281-82. The debate in the House focused on the exchange authority issue and did not even mention the Senate's floor amendment. Id. at 33,282-86. The Senate concurred in the House bill, after one Senator had discussed the differences in the two versions with regard to the Secretary's exchange authority, but without any discussion of the absence of the Senate's floor amendment. Id. at 36,703. It is thus quite likely that the failure to enact the Senate's floor amendment meant only that the Senate saw no purpose in taking on the House over a provision that simply restated existing law
 
 
 [10]
 Indeed, appellants go further: they believe that the intent of the 1920 Congress should control the decision in this case. At oral argument, appellants made the surprising claim that the 1976 Congress could not impose a uniform 12.5% royalty on pre-1976 leases, even by express language in FCLAA, because to do so would be inconsistent with the intent of the 1920 Congress. We disagree with this argument. It is elementary that, within constitutional limits, a later act of Congress can alter rights granted under previous acts. If the 1976 Congress wished to dictate a 12.5% royalty rate for pre-1976 coal leases, only a constitutional bar could stop it from doing so. While we believe the federal coal leasing system created by the 1920 Congress is relevant insofar as it sheds light on what later Congresses were trying to do when they amended the MLLA, it is the intent of those later Congresses that must control our decision, unless implementation of that intent infringes constitutional rights
 
 
 [11]
 The appellants note, for instance, that after voting against a proposal that would have laid down in the statute the royalty rates to be paid for the first 35 years of a coal lease and provided that the rates would thereafter be "as Congress may provide," one Congressman stated that coal mining was such an uncertain business that the best way to meet all possible contingencies was to leave the rates to the discretion of the Secretary. 51 Cong.Rec. 15,277-78 (1914). This statement simply reflects the uncertainty about dictating specifics that Congress felt in 1920. It hardly suggests a permanent abdication of Congress' power in the future to limit the Secretary's discretion
 
 
 [12]
 The parties put forward, in addition to the evidence discussed so far, other excerpts from the legislative history of the 1976 FCLAA. We have carefully considered these references, but although some of them are suggestive, none provides any clear indication of the congressional intent as to the question in issue
 
 
 [13]
 Our holding makes it unnecessary for us to comment on the appellants' argument that it would be inappropriate to defer to the Secretary's interpretation of Sec. 207 because he is a party to the lease contracts at issue. Also, since we agree with the Secretary that he was compelled to apply Sec. 207's 12.5% rate, we need not decide whether the doctrine of SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), would require reversal if we found the Secretary's action to be permissible but not compelled. See Prill v. NLRB, 755 F.2d 941 (D.C.Cir.), cert. denied, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985) (agency action cannot be upheld if it was based on mistaken belief that it was compelled by statute)
 
 
 [14]
 This conclusion applies a fortiori to the one lease at issue for which the readjustment clause does not contain the word "reasonably." See supra note 1
 
 
 [15]
 In his brief, the Secretary states that for a lease readjustment to be timely, the BLM need only send a NIRL prior to the lease's anniversary date, and later transmit the proposed lease terms within the time specified in the NIRL. Brief for Appellee at 22-23. There is some question as to whether this is indeed the interpretation of the statute embodied in the Secretary's own readjustment regulations in force at the time of the readjustments at issue. One section of those regulations at least suggests that the proposed lease terms must be sent before the anniversary date. See 43 C.F.R. Sec. 3451.1(c)(1) (1983). However, no party before this court has raised an issue as to the meaning of the regulations
 Appellant Western Fuels argues that its lease readjustment did not conform to an internal policy, adopted by the BLM in late 1984, of sending the notice of proposed lease terms at least six months before the anniversary date of a lease. However, even assuming that the Department's internal decision was the sort of mandatory agency policy upon which the public is entitled to rely, see, e.g., Doe v. Hampton, 566 F.2d 265, 281 (D.C.Cir.1977), it was not adopted until well after the time appellant's lease was readjusted.