749 F.Supp. 414 (1990)
RHODE ISLAND HIGHER EDUCATION ASSISTANCE AUTHORITY
v.
Lauro F. CAVAZOS, Secretary of the United States Department of Education; and United States Department of Education.
Civ. A. No. 89-0015-T.
United States District Court, D. Rhode Island.
October 24, 1990.
*415 Joseph R. Palumbo, Jr., Middletown, R.I., for plaintiff.
Neil Koslowe, Sp. Litigation Counsel, Civ. Div., Washington, D.C., for defendants.

OPINION AND ORDER
TORRES, District Judge.
This is an action by the Rhode Island Higher Education Assistance Authority ("RIHEAA" or the "Authority") to enjoin the Secretary of the United States Department of Education (the "Secretary") from withholding reimbursements for losses incurred in connection with student loans guaranteed by the Authority pursuant to the federal Guaranteed Student Loan ("GSL") Program. It is presently before the Court for consideration of the parties' cross motions for summary judgment. Those motions require the Court to address the effect of the 1987 amendments to the Higher Education Act of 1965 (the "1987 amendments") which were enacted as part of the Omnibus Budget Reconciliation Act of 1987 (the "Budget Act"). Pub.L. No. 100-203, §§ 3001-3003, 101 Stat. 1330-36 (1987) (codified as amended at 20 U.S.C. § 1072(e) (1988)).

I. FACTS
In 1959 the Rhode Island General Assembly chartered a private nonprofit corporation known as the Rhode Island Higher Education Assistance Corporation ("RIHEAC") and charged it with responsibility for helping to make education loans available to college students. In order to carry out that mandate, RIHEAC established a program under which it encouraged private financial institutions to make student loans by guaranteeing payment in the event of default. In exchange for those guarantees, the lenders paid fees that RIHEAC deposited in its reserve fund. That fund was used to pay both operating expenses and claims made in connection with defaulted loans. The contracts between RIHEAC and participating lenders required RIHEAC to maintain its reserve fund at a level equal to at least 5% of the aggregate principal balance of its outstanding loans. The reserve fund was established with an initial grant of $50,000 from the State of Rhode Island.
In 1965 Congress enacted the Higher Education Act of 1965 (the "Higher Education Act") which created a federally guaranteed student loan program. Pub.L. No. 89-329, 79 Stat. 1232 (1965) (codified as amended at 20 U.S.C. §§ 1071-1098 (1988)). The purpose of that legislation was to encourage *416 the states to establish student loan insurance programs and to provide assistance to those programs already in existence. 20 U.S.C. § 1071(a)(1)(A), S.Rep. No. 673, 89th Cong., 1st Sess. reprinted in 1965 U.S. Code Cong. & Admin.News 4027, 4061-62.
In 1966, RIHEAC elected to participate in the GSL Program by entering into the first of a series of agreements with the Commissioner of Education.[1] One of those agreements (the "Basic Agreement") recognized RIHEAC as a "guaranty agency" authorized to guarantee student loans pursuant to the Higher Education Act and provided for an interest rate subsidy to lenders receiving RIHEAC guarantees. Another agreement (the "Reinsurance Agreement") committed the Commissioner to reimburse RIHEAC for up to 80% of the losses it sustained in connection with defaulted loans. The third agreement (the "Advances Agreement") provided for advances of federal funds to strengthen RIHEAC's reserves. Unlike the reimbursements, advances had to be repaid by the guarantee agency. All such advances received by RIHEAC have, in fact, been repaid in full.
At the time it entered into those agreements, RIHEAC's existing contracts with participating lenders were revised to reduce the minimum reserve requirement from 5% to 1%. Presumably, the lenders agreed to that change because of the Commissioner's commitment to reimburse RIHEAC for losses incurred in fulfilling its guarantee obligations.
The arrangement between RIHEAC and the Commissioner continued without significant change until 1976 when Congress amended the Higher Education Act. The purpose of those amendments (the "1976 amendments") was to encourage creation of more guarantee agencies thereby shifting the burden of administering the GSL Program from the federal government to the states. S.Rep. No. 882, 94th Cong., 2d Sess. 2, 19-27, reprinted in 1976 U.S.Code Cong. & Admin.News 4713, 4714, 4731-4739. To help achieve that goal, the 1976 amendments increased the maximum reimbursement payable for losses incurred as a result of defaulted loans from 80% to 100% They also authorized the Commissioner to compensate the guarantee agencies for some of the administrative costs incurred in administering the GSL Program.
Shortly after the adoption of the 1976 amendments, the Rhode Island General Assembly created the Rhode Island Higher Education Assistance Authority ("RIHEAA" or the "Authority") as a public corporation. RIHEAA's mission was virtually identical to that of RIHEAC. In fact, RIHEAC was merged into RIHEAA and the latter succeeded to all of its predecessor's functions. R.I.Gen. Laws §§ 16-57-1 et seq. (1988). At the time of that merger, RIHEAC had $1,973,867 in its reserve fund which was transferred to RIHEAA's reserve fund.
Like RIHEAC, RIHEAA began participating in the GSL Program by entering into a series of agreements with the Secretary. Those agreements (i.e. a Basic Agreement, an Advances Agreement, a Reinsurance Agreement, and a Supplemental Reinsurance Agreement) were similar to the previous agreements executed by RIHEAC except that the Supplemental Reinsurance Agreement provided for varying rates of reimbursement for losses incurred in connection with defaulted loans. Those rates ranged from 80% to 100% depending upon the default rate on loans guaranteed by the Authority. In order to qualify for 100% reimbursement, the annual reimbursements made by the Secretary could not exceed 5% of the RIHEAA guaranteed loans that were in repayment at the end of the preceding year.[2] RIHEAA has always satisfied that requirement.
The Secretary's authority to enter into such reinsurance agreements was conferred *417 by 20 U.S.C. § 1078(c) which, at that time, provided:
(c) Guaranty agreements for reimbursing losses. (1) Authority to enter into agreements. (A) The Secretary may enter into a guaranty agreement with any guaranty agency, whereby the Secretary shall undertake to reimburse it, under such terms and conditions as the Secretary may establish, with respect to losses (resulting from the default of the student borrower) on the unpaid balance of the principal and accrued interest of any insured loan, including the administrative costs of supplemental preclaim assistance for default prevention as defined in paragraph (6)(C). The guaranty agency shall be deemed to have a contractual right against the United States, during the life of such loan, to receive reimbursement according to the provisions of the subsection.

20 U.S.C. § 1078(c) (emphasis added).
In addition to agreements with the Secretary, RIHEAA also entered into guaranty agreements with participating lenders requiring that it maintain a reserve fund equal to at least 1% of the aggregate principal balance of all outstanding student loans it had guaranteed (the "outstanding loan balance").[3] Furthermore, it executed separate guaranty agreements with those lenders willing to make loans to parents under the federal Parent Loan for Undergraduate Students ("PLUS") Program. Those agreements required a reserve of not less than 2% of the outstanding loan balance. A similar 2% reserve requirement was contained in a later agreement between RIHEAA and the Rhode Island Student Loan Authority ("RISLA"), an agency created to establish a secondary market in which lenders could sell their guaranteed loans to RISLA.[4]
Since RIHEAA's creation, its reserve fund has derived primarily from guarantee fees charged to lenders, the $1.9 million received from RIHEAC in 1977, earnings from investment of the fund's assets and a percentage of the amounts RIHEAA ultimately collects from defaulting borrowers.[5] Federal reinsurance payments (i.e. reimbursements for losses incurred in connection with guaranteed loans) and federal administrative cost allowances (i.e. reimbursements for a portion of the costs incurred in administering the program) are also deposited into the fund. However, those amounts contribute little or nothing to the reserve level since they merely replace the corresponding losses and costs paid from the fund. In other words, these are essentially "wash" items.
In 1987, Congress sowed the seeds of the present controversy by enacting the Omnibus Budget Reconciliation Act of 1987 (the "Budget Act") which took effect on December 22, 1987. Pub.L. No. 100-203, 101 Stat. 1330-36 (1987). That act attempted to reduce the federal deficit by decreasing expenditures for a wide variety of programs. A portion of the Budget Act provided for a one-time reduction of $250 million in the appropriation for the GSL Program. It sought to achieve the reduction by, in effect, transferring that amount from the reserve funds of some guaranty agencies to a fund maintained by the Secretary. To accomplish that purpose, it created a formula under which the Secretary was to calculate the "maximum cash reserve" that each guaranty agency was permitted to maintain. 20 U.S.C. § 1072(e)(1). The Secretary was then directed to determine the extent to which each agency's *418 reserve exceeded that maximum and to require the agency to "eliminate such excess" by any one of four methods. Each method was tantamount to a transfer of the "excess" from the agency's reserve to the Secretary. The four methods were:
(A) by repaying the advances to such agency made by the Secretary ... that are not required to be repaid ...;
(B) by withholding and cancelling claims for reimbursement [reinsurance] otherwise payable ...;
(C) by reducing the amount of [administrative cost allowance] payments ...; or
(D) by any other method of reducing payments from or increasing payments to the Federal Government, including payment of additional reinsurance fees ..., as proposed by the agency and agreed to by the Secretary.
20 U.S.C. § 1072(e)(2). In the event that the excess reserves for all guaranty agencies aggregated more than $250 million, the Secretary was instructed to decrease, pro rata, the amount by which each agency's reserve was to be reduced. Thus the total amount received from all agencies was capped at $250 million. 20 U.S.C. § 1072(e)(4).
On February 16, 1988 the Secretary notified RIHEAA that he had determined the amount of its "excess" reserve to be $6,740,725. As provided in the Budget Act, that computation was based on the agency's financial condition as of fiscal year 1986. 20 U.S.C. § 1072(e)(2). RIHEAA promptly requested a waiver of the "excess" reserve elimination requirement pursuant to Budget Act, § 3001, 20 U.S.C. § 1072(e)(3). On October 20, 1988 the waiver request was denied and, in light of the agency's refusal to accede to any of the payment methods prescribed in § 1072(e)(2), the Secretary began withholding the reinsurance payments provided for in the Supplemental Reinsurance Agreement and expressed his intention to continue doing so until the entire amount of the "excess" was paid.
Shortly thereafter, RIHEAA submitted revised and audited figures showing that its reserve as of the date for determining any "excess" was considerably lower than the figure upon which the Secretary's calculation was based. Accordingly, on February 2, 1989 the Secretary recomputed RIHEAA's excess to be $2,785,156. He has now completely recovered that amount by withholding reinsurance payments on loans guaranteed by the Authority prior to the effective date of the Budget Act.
Although the Budget Act did not expressly purport to modify the existing reimbursement agreements between the Secretary and the guaranty agencies, it did amend the section of the Higher Education Act conferring the Secretary's authority to enter into such agreements. Specifically, it conditioned each guaranty agency's "contractual right against the United States" under the reimbursement agreements upon compliance with the new requirements regarding "elimination" of "excess" reserves. Thus, § 1078(c)(1)(A) was amended to say:
(c) Guaranty agreements for reimbursing losses. (1) Authority to enter into agreements. (A) The Secretary may enter into a guaranty agreement with any guaranty agency, whereby the Secretary shall undertake to reimburse it, under such terms and conditions as the Secretary may establish, with respect to losses (resulting from the default of the student borrower) on the unpaid balance of the principal and accrued interest of any insured loan, including the administrative costs of supplemental preclaim assistance for default prevention as defined in paragraph (6)(C). The guaranty agency shall, subject to section 422(e) [20 USCS § 1072(e)], be deemed to have a contractual right against the United States, during the life of such loan, to receive reimbursement according to the provisions of the subsection.
20 U.S.C. § 1078(c)(1)(A) (emphasis added).
The Secretary contends that the new condition amends the pre-existing reinsurance agreements and also applies retroactively to defaulted loans guaranteed by RIHEAA prior to the Budget Act's effective date. Specifically, he asserts that RIHEAA's right to reimbursement in connection with such loans is now contingent upon its compliance *419 with the new statutory requirements regarding "elimination" of "excess" reserves.
RIHEAA disputes that contention and seeks relief for what it asserts is a breach of contract. Furthermore, it argues that the Secretary acted arbitrarily and capriciously in denying its request for a waiver of the "excess" reserve provisions pursuant to 20 U.S.C. § 1072(e)(3). Finally, RIHEAA claims that the Secretary's actions violate both the due process requirements and the "takings" clause of the Fifth Amendment.[6]

II. DISCUSSION

A. Breach of Contract

As previously noted, the Supplemental Reinsurance Agreement executed in 1979 states that "[t]he Commissioner shall reimburse the Agency ... for an amount equal to one hundred per centum (100%) of the amount of losses incurred by the Agency in the discharge of its insurance obligations incurred under its Student Loan Insurance Program" (emphasis added). Moreover, prior to the 1987 Amendments, the statute authorizing the Secretary to enter into such agreements provided that "[a] guaranty agency shall be deemed to have a contractual right, against the United States, during the life of such loan, to receive reimbursement...." 20 U.S.C. § 1078(c)(2)(A) (emphasis added).
Nevertheless, the Secretary contends that, as a result of the 1987 Amendments, he is entitled to withhold all reimbursement payments that otherwise would have been due to the Authority without regard to when the loans were guaranteed. Specifically, he relies on the language inserted in § 1078(c)(1)(A) which makes a guaranty agency's contractual right to receive reimbursement from the United States "subject to" compliance with the requirements regarding "elimination" of "excess" reserves. In addition, he points to provisions in the Basic Agreement stating that the Authority "shall be bound by all changes in the [Higher Education Assistance Act] ... in accordance with their respective effective dates" and that, if the Authority fails "to comply with any of the provisions of this Agreement or applicable Federal law ...," the Secretary may withhold payments otherwise due.
The flaw in the Secretary's position is that he fails to distinguish between losses incurred on loans guaranteed by the Authority before the 1987 Amendments were adopted and those incurred on loans guaranteed after that time. While the new condition regarding "elimination" of "excess" reserves may apply prospectively to loans guaranteed after its enactment, the Secretary does not cite any provision in the Budget Act indicating that Congress intended to apply it retroactively to negate or restrict a guaranty agency's right to reimbursement in connection with loans previously guaranteed.
If Congress meant to retroactively apply the 1987 Amendments in this manner, it easily could have said so. Absent a clear expression of such an intent, the Budget Act must be deemed to apply prospectively, only. See Kaiser Aluminum & Chemical Corp. v. Bonjorno, ___ U.S. ___, 110 S.Ct. 1570, 1579, 108 L.Ed.2d 842 (1990) (Scalia, *420 concurring) (it is a longstanding principle that legislation is to be applied only prospectively unless Congress specifies otherwise); citing Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence 20 Minn.L.Rev. 775, 781 n. 22 (1936). See also Union Pacific R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) (retrospective operation will not be given to a statute which interferes with antecedent rights unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.").
Indeed construing the amendment to § 1078(c)(1)(A) in the manner urged by the Secretary would render it unconstitutional. Congress has the power to enact legislation that alters the terms of agreements to which the federal government is a party. Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52, 55, 106 S.Ct. 2390, 2396, 2398, 91 L.Ed.2d 35 (1986); Sinking-Fund Cases, 99 U.S. 700, 719-21, 25 L.Ed. 496, 504 (1879). However, the due process clause of the Fifth Amendment prevents it from doing so in a manner that negates obligations the government has already incurred or deprives the other party of a vested contractual right unless the action taken is a necessary exercise of the police power or some other paramount power. Perry v. United States, 294 U.S. 330, 351, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935); Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); see Bowen, 477 U.S. at 52-54, 106 S.Ct. at 2396-97; Sinking-Fund Cases, 99 U.S. at 718-19, 721. The distinction is one between "the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements...." Perry, 294 U.S. at 350-51, 55 S.Ct. at 434-35. Thus, while courts should be "extremely reluctant to construe [such agreements] in a manner that forecloses Congress' exercise of that authority," they must also recognize that "the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights...." Bowen, 477 U.S. at 52, 106 S.Ct. at 2396. That duty was aptly expressed in the Sinking-Fund Cases where the Court said:
The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen.
Sinking-Fund Cases, 99 U.S. at 719.
In this case, the Secretary argues that RIHEAA's right to reimbursement for loans it guaranteed prior to the effective date of the 1987 Amendments did not "vest" until defaults actually occurred and the Authority complied with the contractual requirements that it exercise due diligence in attempting to collect the delinquent amounts. That argument confuses the concepts of vesting and maturing. There are numerous situations in which contractual rights are said to be vested even though there is no current right to enforce them (e.g. a promissory note calling for repayment of a loan at some future date; an annuity contract providing for the payment of benefits upon attainment of a given age; a contract requiring payment for goods or services after they are delivered or performed, etc.). See Hernandez v. Southern Nevada Culinary and Bartenders Pension Trust, 662 F.2d 617, 619 (9th Cir.1981) (an employee's right to his pension benefits vests when he satisfies the pension plan's length of service requirement, but his right to those benefits does not mature until he reaches retirement age).
The Supplemental Reinsurance Agreement is a classic example of such a contract. Under it, the Secretary agreed to reimburse the Authority for losses it incurred in connection with defaults on loans the Authority guaranteed pursuant to the Agreement. Once the Authority guaranteed those loans in reliance on the Secretary's promise, the Secretary's right to repudiate his obligation terminated. In this *421 respect, the Secretary's position is no different from that of a guarantor who induces a lender to make a loan by promising to repay it if the borrower does not. Like the guarantor, the Secretary is bound by his commitment to reimburse in the event of default and may not withdraw that commitment merely because a default has not yet occurred.
Similarly, the fact that, after default, RIHEAA must make reasonable efforts to collect from the borrower before being entitled to reimbursement does not leave the door open for the Secretary to renege on his promise any more than it would permit a loan guarantor to withdraw his guarantee. Failure to comply with such a condition might be grounds for refusing to make reimbursement after default, but the mere existence of such a condition does not justify retraction of the promise to reimburse a before a default has occurred.
These principles are aptly illustrated by the holding in Lynch, which is remarkably analogous to the instant case. There, the plaintiffs were beneficiaries of life insurance policies issued to soldiers pursuant to the War Risk Insurance Act of 1917. The policies expressly provided that they were subject to all amendments to that Act and to all regulations then in force or thereafter adopted. In 1933, at the height of the Depression, Congress attempted to reduce the government's financial burdens by repealing the War Risk Insurance Act and thereby cancelling the policies. When the United States refused to make payment under the policies, the beneficiaries brought suit.
The Supreme Court began its analysis by noting that the insureds had paid monthly premiums as consideration for the government's obligation and held that the policies were contracts of the United States that created vested rights. In so doing, it distinguished the policies from various forms of gratuities that involved no agreement of the parties and could be withdrawn by Congress at anytime. The Court recognized that, pursuant to the provisions of the policy, its terms could be modified by subsequent legislation or regulation. However, it emphasized that such modifications could not disturb vested rights and specifically, that:
[N]o power to curtail the amount of the benefits which Congress contracted to pay was reserved to Congress; and none could be given by any regulation promulgated by the Administrator.
Lynch, 292 U.S. at 578, 54 S.Ct. at 843. The Court went on to say that:
When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.... As Congress had the power to authorize the Bureau of War Risk Insurance to issue [the policies], the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power.
Lynch, 292 U.S. at 579, 54 S.Ct. at 843 (footnotes omitted).
The Court concluded by rejecting the suggestion that the economic crisis created by the Depression justified repudiation of the policies. In words that are particularly applicable to the instant case, it said:
No doubt there was in March, 1933, great need of economy. In the administration of all government business economy had become urgent because of lessened revenues and the heavy obligations to be issued in the hope of relieving widespread distress. Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would not be the practice of economy, but an act of repudiation.
Lynch, 292 U.S. at 580, 54 S.Ct. at 844.
A similar result was reached in Perry. There the plaintiff purchased a bond issued by the United States pursuant to a statute enacted in 1917. The bond stated that it was payable at maturity in "United States gold coin of the present standard of value." In 1933, in response to the Depression, *422 Congress adopted a joint resolution making such bonds redeemable only in "legal tender currency" which had a lesser value. The Court concluded that, to the extent the resolution diminished the value to which the plaintiff was entitled under the terms of the bond, it exceed Congress' power. In reaching that conclusion, it stated:
[T]he Government seems to deduce the proposition that when, with adequate authority, the Government borrows money and pledges the credit of the United States, it is free to ignore that pledge and alter the terms of its obligations in case a later Congress finds their fulfillment inconvenient.... On that reasoning, if the terms of the Government's bond as to the standard of payment can be repudiated, it inevitably follows that the obligation as to the amount to be paid may also be repudiated. The contention necessarily imports that the Congress can disregard the obligations of the Government at its discretion and that, when the Government borrows money, the credit of the United States is an illusory pledge.
We do not so read the Constitution.
Perry, 294 U.S. at 350, 55 S.Ct. at 435.
Lynch and Perry control the instant case. Even, the facts in Lynch are strikingly similar to those in this case. In both cases, the plaintiffs contracted with government agencies pursuant to statutes expressly authorizing the agencies to enter into such contracts. In each case, consideration was given in exchange for the agency's commitment. In one case it took the form of premiums, and in the other it took the form of loan guarantees made in reliance on that commitment. Furthermore, in both cases, the agencies sought to renege on their commitments based upon subsequent amendments to the authorizing statutes. If anything, the facts underlying RIHEAA's claim are more compelling because the statute in effect when the contract was executed expressly conferred on the Authority a "contractual right against the United States" to receive reimbursement "during the life" of any guaranteed loan on which it incurred a loss as a result of default. Like the policy rights in Lynch, RIHEAA's right to reimbursement vested when the contract was made and the consideration given even though the right to collect would not mature until occurrence of the specified event (i.e. death of the insured or the occurrence of a default). Moreover, as in both Lynch and Perry, RIHEAA's rights could not be unilaterally negated or materially altered by subsequent changes in the law pursuant to which the contracts creating those rights were executed. To permit that would be to render the contract, itself, illusory.
The Secretary relies heavily on Bowen and the Sinking-Fund Cases. That reliance is misplaced. In Bowen, a number of California state agencies elected to voluntarily participate in the Social Security system by entering into an agreement with the Department of Health and Human Services pursuant to a statute permitting the agencies to terminate their participation upon giving two years advance notice. In order to preserve the integrity of the Social Security system, Congress later repealed the termination provision even as to those agencies which had already given notice. The Court upheld the repeal legislation on the ground that the original statute did not confer any contract rights on the agencies and that it contained a provision expressly providing that Congress retained the power to amend both the law and the agreement. The Court was careful to distinguish Lynch and Perry saying:
But the "contractual right" at issue in this case bears little, if any, resemblance to rights held to constitute "property" within the meaning of the Fifth Amendment. The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in [the statute] itself. The provision constituted neither a debt of the United States, see Perry v. United States, supra, nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, see Lynch v. United States, supra.

Bowen, 477 U.S. at 55, 106 S.Ct. at 2398.
In the Sinking-Fund Cases, the Court found that an amendment to the statutory *423 charters granted to two railroad companies increasing the amounts they had to contribute to a sinking fund designed to insure repayment of an amount advanced to them by the government did not deprive the railroads of any vested contractual right because it did not alter either the amount of the debt or the repayment date. Thus, the Court stated:
The original contracts of loan are not changed. They remain as they were before, and are only to be met at maturity. All that has been done is to make it the duty of the company to lay by a portion of its current net income to meet its debts when they do fall due.
Sinking-Fund Cases, 99 U.S. at 725.
In this case, RIHEAA clearly did have a "contractual right" to reimbursement and the interpretation advocated by the Secretary would diminish that right by $2.7 million (i.e. the "excess" reserve calculated by the Secretary). Therefore, to the extent that the newly created requirement is retroactively applied to loans previously guaranteed, it would impermissibly deprive the Authority of vested rights under the Supplemental Reinsurance Agreement.

B. Denial of Waiver

Even if it could be said that the Authority's right to reimbursement for previously guaranteed loans was conditioned upon compliance with the new "excess" reserve "elimination" requirement, the Authority would have been entitled to a waiver of that requirement. In an apparent attempt to provide relief to agencies experiencing serious financial problems and to avoid impairing their guaranty obligations under existing contracts, Congress provided for waivers of the "excess" reserve "elimination" requirements by including the following language in the Budget Act amendments:
(3) Appeals based on special circumstances.
(A) If the Secretary determines, on the basis of an application from a guaranty agency, that 
(i) the agency's financial position has deteriorated significantly since the end of the preceding fiscal year;
(ii) significant changes in the economic circumstances (such as a change in agency current cash reserves) or the loan insurance program render the limitations of paragraph (1) inadequate for the continued functioning of the agency; or
(iii) in recovering funds as required by this subsection, a guaranty agency would be compelled to violate contractual obligations existing on the date of enactment of this subsection that require a specified level of reserve funds to be maintained by such agency;
the Secretary may waive, in whole or in part, the imposition of the remedies required by paragraph (2) for such agency.
Budget Act, § 3001, 20 U.S.C. § 1072(e)(3). RIHEAA requested a waiver on all three grounds. However, the Court need only consider the request made pursuant to subsection (iii).
As previously noted, on the date the Budget Act took effect, RIHEAA's contracts with participating lenders required the agency to maintain its reserve fund at a level equal to at least 1% of its outstanding loan balance (the "1% requirement").[7] Similar provisions in RIHEAA's contracts with PLUS lenders and RISLA required the maintenance of reserves equal to at least 2% of the outstanding loan balance (the "2% requirement"). On October 20, 1988, when the Secretary denied the initial waiver request and began withholding reimbursements, RIHEAA's outstanding loan balance was $235,324,411. Consequently, the reserves necessary to satisfy the 1% and the 2% requirements were $2,353,244 and $4,706,488 respectively. At that time, *424 the agency's actual reserve was $3,497,476. Simple arithmetic shows that reducing the reserve by the $2,785,156 which the Secretary determined to be "excess" would have left a reserve balance of $712,320. That amount would have been $1,640,924 below the 1% requirement and $3,994,168 below the 2% requirement.
Nevertheless, the Secretary denied the waiver request. In so doing, he cited two reasons. First, he asserted that compliance with the statutory requirements would not have "compelled" the agency to violate its contractual obligations with respect to the 2% requirement because the agency was already in violation of that requirement. Second, he pointed to the Authority's failure to provide evidence that any lender or secondary market had monitored compliance with the 2% requirement or insisted on strict enforcement of it thereby implying that the requirement was fictitious.[8] No explanation was offered as to why a waiver was not granted to prevent the Authority's reserve from falling below the 1% requirement.
In reviewing the Secretary's action, the Court must bear in mind that the standard to be employed is a relatively strict one. His decision may be overturned only if he acted arbitrarily or capriciously, abused his discretion or acted in a manner not in accordance with law. 5 U.S.C. § 706(2)(A); Fidelity Federal Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153-54, 102 S.Ct. 3014, 3022-23, 73 L.Ed.2d 664 (1982). Consequently, there must be a showing that the Secretary's action lacked a rational basis, Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 42-43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), or was "without consideration and in disregard of the facts and circumstances of the case." See Moore v. Custis, 736 F.2d 1260, 1262 (8th Cir.1984).
In this case, the Court concludes that such a showing has been made. At the very least, the Secretary should have granted a waiver to the extent necessary to prevent the Authority from violating its contractual obligations with respect to the 1% requirement. As already noted, the denial did not even address that requirement. Moreover, neither of the reasons cited in connection with the 2% requirement are applicable to the 1% requirement. As can been seen from the figures previously recited, on the waiver date RIHEAA's reserves exceeded the 1% requirement by $1,144,232. In fact, the record indicates that the Agency's reserves have never fallen below the 1% requirement. Consequently, there can be no question that requiring RIHEAA to reduce that reserve by $2,785,156 would have "compelled" it to violate the 1% requirement by decreasing the reserve to a level $1,640,924 below that requirement.
Furthermore, there is nothing to indicate that even the Secretary viewed the 1% requirement as anything less than a binding obligation. Although he requested information about monitoring and enforcement by parties to the 2% requirement contracts, no such request was made with respect to the 1% requirement contracts. The absence of such a request is readily understandable in light of the fact that the Authority was never in violation of the 1% requirement. Its actions in maintaining reserves above that level tend to confirm that the requirement was a "real" one. As a result, lenders participating in the 1% requirement contracts would have had no occasion to "insist on strict enforcement."
In short, it is clear that requiring RIHEAA to comply with the new "elimination" *425 of "excess" reserve requirements compelled it to violate its 1% requirement contracts. Nor has the Secretary even articulated a reason for disregarding that requirement. In fact, the record is devoid of any reasonable basis for characterizing the 1% requirement as "fictitious." Therefore, the Secretary acted arbitrarily in denying a waiver, at least to the extent of $1,640,924.
However, the Court's review does not end there. The Secretary's reasons for concluding that recovery of the "excess" reserves would not compel the Authority to violate its 2% requirement contracts do not withstand scrutiny. The assertion that, because RIHEAA was already in violation of the 2% requirement, forcing it to further reduce its reserves would not "compel" it to violate that requirement distorts both logic and the plain meaning of the statute. The interpretation of § 1072(e)(3)(A)(iii) is a question of law to be decided by the Court. In construing the statute, the Court does not owe the same degree of deference as it owes to the Secretary's factual findings. 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law"); Pollgreen v. Morris, 770 F.2d 1536, 1544, reh. denied en banc, 781 F.2d 905 (11th Cir. 1985); North American Industries, Inc. v. Feldman, 722 F.2d 893, 898-99 (1st Cir. 1983). Rather, the Court need "accept the administrative construction of a statute only so far as it is reasonable ... and consistent with the intent of Congress in adopting the statute." North American Industries, 722 F.2d at 898 (citations omitted).
Viewing the statute through that prism, it is clear that the purpose of § 1072(e)(3)(A)(iii) was to ensure that compliance with the reserve reduction requirements would not impair an agency's ability to fulfill its contractual reserve obligations. Requiring an agency that is already in default of those obligations to further reduce its reserves, does as much to "compel" a violation as requiring an agency not in default to reduce its reserves below the required level would. In both cases, the reduction affects the agency's ability to fulfill its reserve obligations. In fact, in the former case the magnitude of the impairment is greater because an agency already in default, unlike one with funds in excess of its reserve requirement, has no "surplus" that may be used to pay a portion of the reduction. Consequently, the magnitude of the agency's default is increased by the full amount that is diverted from its reserve fund.
To read the statute in the manner urged by the Secretary would lead to absurd results. If taking money from an agency whose funds were already insufficient to meet its reserve requirements did not constitute "compelling" the agency to violate its contractual obligations, there would be no limit on how much the Secretary could "recover" from it. On the other hand, the amount recoverable from an agency with funds in excess of its reserve requirement would be limited to the amount of that excess. Such a result would defy both logic and the manifest purpose of the waiver statute.
In this case, denial of the requested waiver increased the amount by which RIHEAA fell below the requirement of its 2% contract from a relatively modest $.8 million to a whopping $3.6 million. Put another way, it more than quadrupled the deficiency and reduced RIHEAA's reserve from approximately 83% of the 2% requirement to 24%. If that does not constitute compelling a violation of the agency's contractual obligations, it is difficult to imagine what does.
The second reason cited by the Secretary for denying the waiver (i.e. that the 2% requirement was "fictitious") is a little more difficult to deal with because it involves a more factually oriented question. Consequently, the standard of review is more stringent. It requires only that there be some rational basis to support the Secretary's conclusion. However, in this case, there is no such basis. In implying that the 2% requirement was purely a "paper" requirement, the Secretary relied on RIHEAA's failure to adhere to that requirement and its failure to provide evidence that any lender or the secondary market had monitored compliance or had insisted *426 upon strict enforcement. While those factors may furnish a link in a potential chain of evidence necessary to support the Secretary's conclusion, they fall far short of constituting the entire chain.
The record shows that, until its books were audited in 1988, RIHEAA's reserve had been greatly overstated. Thus, the figures the Authority supplied to the Secretary in connection with its initial waiver application showed a reserve of $8,872,723 as of September 30, 1987 which was well in excess of the 2% requirement. However, the subsequent audit revealed that the reserve on that date was only $4,513,343, and therefore the Authority was in default of the 2% requirement. Under the circumstances, it would be patently unreasonable to infer that RIHEAA was aware of the default before the audit. If it was, it certainly would not have been in its interest to submit the inflated reserve figure for use by the Secretary in calculating the "excess" reserve the Authority would be required to "eliminate." Consequently, this fact is a very tenuous basis for inferring that RIHEAA considered the requirement to be anything less than an enforceable obligation.
Furthermore, as RIHEAA explained in its response to the Secretary's requests, that error was also contained in the annual financial statements it sent to lenders and RISLA. Therefore, there would be no reason for them to have insisted on strict enforcement of the 2% requirement because they had no cause to believe it was being violated. Accordingly, the lenders' failure to take action does not support the conclusion that they viewed the requirement as fictitious. That conclusion is especially difficult to accept in the absence of anything to suggest that the formally executed written contracts between RIHEAA and the lenders were anything other than arm's length agreements or that the parties had any reason to collude for the purpose of inserting a fictitious reserve requirement. On the contrary, the PLUS lenders and the secondary market had every incentive to insist on such a requirement and to see that it was enforced.
Finally, there is no evidence to suggest that the 2% requirement was unreasonably high. Indeed, the record shows that, prior to RIHEAA's participation in the GSL Program, its contracts with lenders called for a 5% reserve. Moreover, the record is devoid of any indication that the Secretary ever questioned the reasonableness of that requirement before the waiver question arose.
In his memorandum, the Secretary attempts to buttress his decision by pointing out that the RISLA contract requires the Authority to maintain a 2% reserve level "or (B) such lesser amount agreed to by the trustee and [Manufacturers Hanover Trust Company]" and that it further provides that in the event the reserve falls below required levels, RIHEAA is only obligated to "take all steps necessary to restore the amount then on deposit" to the required level "as rapidly as is practicable under the circumstances then in existence." The Secretary argues that these provisions demonstrate that RIHEAA was not obligated to meet the 2% requirement. That argument suffers from several infirmities. First, there is nothing in the record suggesting that any such lesser amount was ever agreed upon or that the trustee and/or Manufacturers Hanover would have had any reason to agree to one.
Second, the mandate that RIHEAA "take all steps necessary" to cure any deficiency "as rapidly as is practicable" indicates that the parties did view the 2% requirement as a binding obligation. If the 2% requirement was fictitious, as the Secretary suggests, there would have been no reason for inserting such a provision. On its face, this language appears designed to require RIHEAA to promptly cure a default if it occurs and not to authorize RIHEAA to disregard the 2% requirement.
Finally, and most significantly, these provisions appear only in the RISLA contract and not in the agreements between RIHEAA and PLUS lenders. The latter agreements state only that:
As security for the performance of its obligations hereunder, the Authority covenants that it will at all times, so long as *427 the Lender is the holder of any guaranteed note, hold unencumbered, except as encumbered by the issuance of loan guaranty certificates, cash or marketable securities having a market value of not less than two percent (2%) of the aggregate amount of unpaid principal of all guaranteed notes as to which it has received a notice of loan, including loans made under the Guaranteed Student Loan plan.
Therefore, even if the Secretary's argument with respect to the RISLA contract is accepted, it has no bearing on the binding nature of the 2% requirement contained in the agreements with PLUS lenders.
In sum, the Court finds that the Secretary's conclusions are contrary to the overwhelming weight of the evidence and that he acted arbitrarily and contrary to law in denying RIHEAA's waiver request. Because of its conclusions with respect to the breach of contract and the waiver claims, the Court need not address the plaintiff's Fifth Amendment challenges to the statute.

III. CONCLUSION
For all of the foregoing reasons, the plaintiff's motion for summary judgment is granted, and the defendants' motion for summary judgment is denied. Accordingly, the Court directs that judgment be entered in favor of the Rhode Island Higher Education Assistance Authority in the amount of $2,785,156 and that the defendants be permanently enjoined from withholding any reimbursements otherwise due pursuant to the reinsurance agreements between the parties with respect to defaulted loans guaranteed by the Authority which were outstanding on December 22, 1987.
IT IS SO ORDERED.
NOTES
[1] The Secretary of Education became the Commissioner's successor when the Department of Education was created and succeeded to the functions of the former Department of Health, Education, and Welfare's Office of Education.
[2] Beginning in 1986, guarantee agencies were required to pay a reinsurance fee equal to ¼ of 1% of the new loans guaranteed each year. 20 U.S.C. § 1078(c)(9).
[3] It should be noted that RIHEAA is the sole guarantor of loans made pursuant to the GSL Program. The Secretary's only obligation is to reimburse RIHEAA pursuant to the terms of the reinsurance and supplemental reinsurance agreements. Thus, in the event of default, the lenders' only recourse is against RIHEAA. It should also be noted that, after making good on its guarantees, RIHEAA runs the risk that if its default rate exceeds 5% it will receive only partial reimbursement from the Secretary and must make up any shortfall from its reserve.
[4] RISLA creates such a market by purchasing guaranteed loans with the proceeds from the sale of bonds it issues and for which the loans are pledged as collateral.
[5] As an incentive to recoup amounts paid pursuant to its guarantees, RIHEAA is permitted to keep 30% of the sums it is able to collect from defaulting student borrowers. The remaining 70% must be remitted to the Secretary.
[6] Only one other court dealing with the constitutionality of the 1987 Budget Act amendments to the Higher Education Act has decided the case on the same grounds as the present one, albeit reaching opposite conclusions. Education Assistance Corporation v. Cavazos, Civ. No. 88-1054, slip op., 1989 WL 141662 (N.D.S.D. July 14, 1989), aff'd, 902 F.2d 617 (8th Cir.1990) (Secretary did not act arbitrarily and capriciously in denying waiver; not a breach of contract for Congress to condition the right to receive reinsurance upon compliance with Budget Act amendments).

Courts in other similar cases have considered different aspects of this problem. See South Carolina State Educ. Assistance Auth. v. Cavazos, 716 F.Supp. 886 (D.C.S.C.1989), rev'd, 897 F.2d 1272 (4th Cir.1990), cert. denied, Maryland Higher Ed. Corp. v. Cavazos, ___ U.S. ___, 111 S.Ct. 243, 112 L.Ed.2d 202 (1990); Ohio Student Loan Comm'n v. Cavazos, 709 F.Supp. 1411 (S.D.Ohio 1988), rev'd, 900 F.2d 894 (6th Cir. 1990); Great Lakes Higher Educ. Corp. v. Cavazos, 911 F.2d 10 (7th Cir.1990); North Carolina v. United States, 725 F.Supp. 874 (E.D.N.C.1989), aff'd, 897 F.2d 1272 (4th Cir.1990), cert. denied, Maryland Higher Ed. Corp. v. Cavazos, ___ U.S. ___, 111 S.Ct. 243, 112 L.Ed.2d 202 (1990).
[7] The provision states: "As security for the performance of its obligations hereunder, the Authority covenants that it will, at all times, as long as the Lender is the holder of any guaranteed note, hold unencumbered, except as encumbered by the issuance of Loan Guarantee Certificates, cash or marketable securities having a market value of not less than one percent (1%) of the aggregate amount of unpaid principal of all guaranteed notes as to which it has received a payment of guarantee fee representing a consumated [sic] loan."
[8] In his memorandum, the Secretary seems to imply that denial of the waiver is also supported by the erroneously overstated reserve figures submitted by the Authority in connection with its initial application and by the fact that the Authority did not mention its contracts with RISLA until several months after the original application was filed. However, it is clear that as late as February 2, 1989, the Secretary invited the Authority to submit additional proof in support of its waiver request and agreed to treat such proof as having been received with the original application. Moreover, the Secretary's denial letter of May 26, 1989 does not cite these factors as reasons for his decision. In fact, on February 2, 1989 the Secretary notified RIHEAA that he would "treat the corrected data as if it had been available when the original decision [to deny the waiver] was made."