## BOWEN, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL. *v.* PUBLIC AGENCIES OPPOSED TO SOCIAL SECURITY ENTRAPMENT ET AL.

No. 85–521.   Argued April 28, 1986—Decided June 19, 1986

42

POWELL, J., delivered the opinion for a unanimous Court.

*Assistant Attorney General Willard* argued the cause for appellants. With him on the briefs were *Solicitor General Fried, Deputy Solicitor General Geller, Charles A. Rothfeld, William Kanter,* and *Douglas Letter.*

*Andrew D. Hurwitz* argued the cause for appellees. *Ernest F. Schulzke* filed a brief for appellees Public Agencies Opposed to Social Security Entrapment et al. *John K. Van de Kamp,* Attorney General, *N. Eugene Hill,* Assistant Attorney General, and *Charles C. Kobayashi,* Supervising

Deputy Attorney General, filed a brief for appellee State of California.*

JUSTICE POWELL delivered the opinion of the Court.

On this appeal we review a decision of the District Court for the Eastern District of California that § 103 of the Social Security Amendments Act of 1983, 97 Stat. 71, 42 U. S. C. § 418(g) (1982 ed., Supp. II), effected a taking of property within the meaning of the Fifth Amendment by preventing States from withdrawing state and local government employees from the Social Security System.

## I

## A

The Social Security Act of 1935, 49 Stat. 620, as amended, 42 U. S. C. § 301 *et seq.* (1982 ed. and Supp. II), established an insurance program for "persons working in industry and commerce as a long-run safeguard against the occurrence of old-age dependency." H. R. Rep. No. 1300, 81st Cong., 1st Sess., 3 (1949). From that relatively humble beginning, the coverage of the Act has been expanded to provide benefits not only to the "insured worker in his old age," *ibid.*, but also to "individuals and families when workers retire, become disabled, or die." S. Rep. No. 98–13, vol. 2, p. 78 (1983).[1] The "basic idea" of Social Security "is that, while they are working, employees and their employers pay earmarked social security contributions (FICA taxes) . . . . Then, when earnings stop, or are reduced because of retirement in old-

---

*Benna Ruth Solomon* and *Andrew D. Hurwitz* filed a brief for the Council of State Governments et al. as *amici curiae* urging affirmance.

[1] According to the Senate Special Committee on Aging, the Social Security System is "much more" than a "retirement program for older workers. . . . Social security is also family security, protecting workers and their families from loss of earnings because of death, retirement, or disability." Senate Special Committee on Aging, Termination of Social Security Coverage: The Impact on State and Local Government Employees, 94th Cong., 2d Sess., 9 (Comm. Print 1976) (hereinafter Senate Report on Aging).

age, death, or disability, cash benefits are paid to partially replace the earnings that were lost." *Ibid.* The System operates on a "pay as you go" basis, with current contributions "largely paid out in current benefits," *ibid.* In the words of Congress, the System now functions "as the Nation's basic social insurance program." H. R. Rep. No. 98–25, p. 19 (1983). To ensure that this important program could evolve as economic and social conditions changed, Congress expressly reserved to itself "[t]he right to alter, amend, or repeal any provision of" the Act. 42 U. S. C. § 1304.[2]

As of 1983, more than 90% of the Nation's paid employees, a total of more than 115 million people, participated in the Social Security System. H. R. Rep. No. 98–25, at 13.[3] Participation in the System is, and has been since its inception, "basically mandatory." *Id.,* at 19. Therefore, most workers covered by the System and their employers have no choice whether or not to participate. In 1935, when the Act was adopted, Congress faced questions as to whether it could compel the States and their political subdivisions to include their employees in the System.[4] Therefore, the Act at that time excluded such employees from its coverage. See 42 U. S. C. § 410(a)(7). Responding to subsequent pressure

---

[2] Congress included this provision in the original Act, and has retained it ever since. See *Flemming* v. *Nestor,* 363 U. S. 603, 610–611 (1960).

[3] "The ten percent of workers not . . . covered by social security [in 1983] include[d] most Federal civilian workers (2.4 out of 2.7 million), about 30 percent of State and local employees (approximately 3 million), and 10–15 percent of employees of nonprofit organizations (up to 1 million)." H. R. Rep. No. 98–25, at 13.

[4] As Congress explained when it was studying the reasons underlying States' decisions to withdraw employees from the System, "[t]he Social Security Act of 1935 excluded from coverage all employment for States and localities, primarily because of the question of the constitutionality of any general levy of the employer tax on States and localities." Subcommittee on Social Security of House Committee on Ways and Means, Termination of Social Security Coverage for Employees of State and Local Governments and Nonprofit Groups, 97th Cong., 2d Sess., Ser. No. WMCP: 97–34, p. 20 (Comm. Print 1982) (hereinafter H. R. Comm. Print 97–34).

from States that sought Social Security coverage for their employees, in 1950 Congress enacted § 418, the provision at the heart of the controversy in this case.

Section 418 authorizes voluntary participation by States in the Social Security System.[5] Under § 418(a), States may obtain coverage for their employees and employees of their political subdivisions, enrolling all or only specified "coverage groups" of workers. 42 U. S. C. § 418(a)(1) (1982 ed., Supp. II); see § 418(b)(5) (defining coverage group).[6] States enter the System by executing "an agreement" (§ 418 Agreement) with the Secretary of Health and Human Services (Secretary).[7] While § 418 gives States some authority over the content of the Agreements, i. e., States may identify the covered employees, the provisions of a § 418 Agreement are required to be "not inconsistent with the provisions of" § 418. § 418(a)(1). From its enactment in 1950 through 1983, § 418 permitted States to terminate their § 418 Agreements "[u]pon giving at least two years' advance notice in writing to the [Secretary]." § 418(g)(1). Once a State exercised its option to withdraw, it could not thereafter reenter the System. § 418(g)(3).

Following adoption of § 418, all 50 States entered into § 418 Agreements with respect to their own employees, local gov-

_____

[5] At the time Congress enacted the amendment challenged in this case, it explained that provision for voluntary participation by employees of state and local governments was "the result of congressional desire to extend coverage as quickly and with as little difficulty as possible to those employees who needed it most." H. R. Rep. No. 98–25, at 19.

[6] Under the Act, therefore, States decide which groups of employees will receive Social Security coverage. Section 418(d)(3) creates an exception to this rule. Where state employees already are members of a retirement program, that section requires that a majority of such employees agree to participate in the Social Security System. 42 U. S. C. § 418(d)(3) (1982 ed. and Supp. II).

[7] For purposes of conciseness, we use the term "Secretary" to refer to the federal official responsible for administration of the System both under the current and prior versions of the Social Security Act.

ernment employees, or both.[8]  "By the early 1960's most States had made coverage agreements," H. R. Rep. No. 98–25, at 18, and the percentage of state and local employees enrolled in the System increased from 11% in 1951 to 70% in 1970, H. R. Comm. Print 97–34, at 25.  Since 1970, "[c]overage of State and local employees has remained fairly constant at 70–72 percent."  H. R. Rep. No. 98–25, at 18.  As of 1983, "some 9.4 million out of the approximately 13.2 million State and local employees" participated in the Social Security System.  *Id.*, at 17.

For the first 20 years of their participation, "very few" States exercised their option under § 418(g) to withdraw from the System.  *Id.*, at 18.  Until the mid-1970's, the number of state and local employees "leaving the system was always greatly exceeded by the number of newly-covered employees — in most years, by 50,000 or more."  *Ibid.*[9]  Starting in 1976, however, this trend reversed, and the "numbers of positions being terminated from coverage" began to exceed "the numbers of newly-covered positions."  *Ibid.*  From 1977 through 1981, "termination activity was greater than in the previous ten years," with coverage "terminated for 96,000 State and local government employees."  *Ibid.*  As of 1982, coverage was "terminated for 595 State entities employing 190,000 workers."  *Ibid.*  Finally, "for the two-year period of 1983–84, terminations [were] pending for 634 State and local entities employing 227,000 workers."  *Ibid.*

After studying the trend towards termination of § 418 Agreements and the reasons for it,[10] Congress determined

---

[8] As of 1983, the employees of Alaska, "the only State to withdraw from the system, and of Maine, Massachusetts, Nevada, and Ohio, which never chose to participate in the system," were not covered by Social Security. H. R. Rep. No. 98–25, at 17.  Each of those States, however, was party to a § 418 Agreement that provided coverage to local government employees.

[9] During these years, "many terminations were caused by consolidation of local jurisdictions, rather than by withdrawal from the social security system."  *Id.*, at 18.

[10] The Senate Special Committee on Aging found that States offered the following reasons for terminating their § 418 Agreements: employees

that the increasing rate of withdrawals was threatening the integrity of the System in a number of important respects. As an initial matter, Congress observed that the current rate of withdrawals would cost the System between $500 million and $1 billion annually. H. R. Comm. Print 97–34, at 13–14. Congress further concluded that States' ability to withdraw was "inequitable both for the employees who lose coverage and for the vast majority of the nation's workforce who continue to pay into the system." H. R. Rep. No. 98–25, at 18–19. While States terminating § 418 Agreements often did so in the course of designing benefit packages that would attract long-term workers, Congress believed that sound social policy also required protection of employees who move from job to job. *Id.*, at 19. Moreover, "the shifting of the tax burden of social security from those workers who withdraw, but who remain entitled to future benefits based on their past earnings," created resentment on the part of workers whose participation in the System was mandatory.[11] *Ibid.*

wanted more take-home pay through a reduction in payroll deductions; state and local governments sought to cut costs by dropping Social Security coverage; news reports concerning "the projected exhaustion of social security trust funds in the 1980's" led employees to believe that benefits would cease; state and local governments believed that Social Security taxes would continue to rise, and thus viewed termination as a means "to achieve more static and budgetable expenditures"; some employees favored termination because they perceived that they would receive Social Security benefits even if they were no longer required to pay into the System; and alternative retirement plans were believed to pay higher levels of benefits. Senate Report on Aging 6–8; see also H. R. Comm. Print 97–34, at 6–7. The Committee also found that "many" decisions to withdraw from the System were made in the absence of "[i]nformation necessary for informed judgments." Senate Report on Aging 8.

[11] Congress regarded voluntary participation by some employees, such as those of state and local governments, as an anomaly in an otherwise mandatory program. "The fundamental principle underlying compulsory coverage for most workers is that responsibility for paying for insurance against such risks should be borne by the society as a whole to the extent possible." H. R. Comm. Print 97–34, at 4. Mandatory participation is necessary to sustain the " 'pay-as-you-go' financing structure," particularly since workers retain coverage "regardless of how many times they change

Accordingly, Congress decided to amend § 418(g) by repealing the termination provision. As amended, § 418(g) provides that no § 418 Agreement "may be terminated, either in its entirety or with respect to any coverage group, on or after April 20, 1983." The amendment expressly prevents States from withdrawing employees from the System even if a termination notice had been filed prior to enactment of the amendment.[12]

### B

On March 9, 1951, California and the Secretary entered into a § 418 Agreement, effective as of January 1, 1951, under which the parties agreed to extend Social Security coverage to employees of the State and its political subdivisions. The Agreement recited that its provisions were "in conformity with" § 418, and authorized the State to modify the Agreement to include additional groups of employees, "such modification to be consistent with the provisions of" § 418. The Agreement also included a clause that permitted the State to terminate the Agreement either in its entirety or with respect to particular coverage groups. The terms of the clause

---

their jobs in a lifetime." *Ibid.* Mandatory participation ensures workers that they will obtain a minimum level of benefits in the event of a catastrophe that the worker did not foresee or plan for. *Ibid.* In the context of a mandatory system, voluntary participation for some employees was, in Congress' view, "inconsistent with the principle of equal treatment of all citizens." *Id.,* at 5.

[12] The amendment, set out in Pub. L. 98–21, § 103, 97 Stat. 71–72 provides:

"(a) [42 U. S. C. § 418(g)] is amended to read as follows:

" 'Duration of Agreement

"(g) No agreement under this section may be terminated, either in its entirety or with respect to any coverage group, on or after the date of the enactment of the Social Security Amendments of 1983.'

"(b) The amendment made by subsection (a) shall apply to any agreement in effect under [§ 418] on the date of the enactment of this Act, without regard to whether a notice of termination is in effect on such date, and to any agreement or modification thereof which may become effective under such [§ 418] after that date."

exactly mirrored the statutory termination provision embodied in § 418(g).[13]

When Congress amended § 418(g) in 1983, California had filed termination notices on behalf of 71 of its political subdivisions, employing approximately 34,000 persons.[14] When the amendment prevented the termination notices from taking effect, appellees commenced the lawsuits underlying this appeal, naming as defendants the United States and the Secretary and Undersecretary of the Department of Health and Human Services. The first lawsuit was brought by several public agencies of California, their employees and taxpayers, and by an organization calling itself Public Agencies Opposed to Social Security Entrapment. These parties alleged, among other claims, that amended § 418(g) had deprived them of their "contract rights" without just compensation in violation of the Fifth Amendment.[15] In the second lawsuit, the State of California sought to enjoin enforcement of § 418(g) as well as a declaration that the section was un-

---

[13] The termination provision in California's § 418 Agreement stated:

"The State, upon giving at least two years' advance notice in writing to the [Secretary], may terminate this agreement, either in its entirety or with respect to any coverage group, effective at the end of a calendar quarter specified in the notice, provided, however, that the agreement may be terminated in its entirety only if it has been in effect not less than five years prior to receipt of such notice, and provided further that the agreement may be terminated with respect to any coverage group only if it has been in effect with respect to such coverage group for not less than five years prior to receipt of such notice." Reprinted, App. 31.

[14] If these employees were withdrawn from the System, "approximately $33.7 millio[n] would be lost to the social security trust funds in 1984." *Id.*, at 61.

[15] Plaintiffs in this lawsuit also alleged that the enactment denied them their contract rights without due process, that it constituted an attempt to regulate " 'essential state and local government functions,' in violation of the Tenth Amendment," and that they were entitled to specific performance for the Government's breach of contract. *Public Agencies Opposed to Social Security Entrapment* v. *Heckler,* 613 F. Supp. 558, 565 (ED Cal. 1985).

constitutional. The State claimed that the federal defendants had acted in excess of their constitutional authority and had violated the Tenth Amendment by breaching their contract with the State and by impairing the State's "ability . . . to structure its relationships with its employees."[16]   App. 26–27.

Ruling on cross-motions for summary judgment, the District Court held that § 418(g) was unconstitutional. *Public Agencies Opposed to Social Security Entrapment* v. *Heckler*, 613 F. Supp. 558 (ED Cal. 1985).[17]   The court decided that the § 418 Agreement created a "contractual right" to withdraw from the Social Security System that ran in favor of both the State and its public agencies. This contractual right existed independently of the statutory termination pro-

---

[16] Though the State did not press any claim that amended § 418(g) effected a taking of its property without the compensation required by the Fifth Amendment, the District Court rested its decision on that ground, finding it unnecessary to reach any of the arguments raised by the State. Therefore, none of those arguments are before us.

[17] Before reaching the merits, the District Court determined that the plaintiffs in both suits, appellees here, had standing to challenge the validity of the enactment. With respect to the first lawsuit, brought by the public agencies and certain individuals, the court concluded that the agencies alleged an injury sufficient to confer standing because they claimed that amended § 418(g) deprived them of their contractual rights as third-party beneficiaries of the State's § 418 Agreement. *Id.*, at 567–570. The individual plaintiffs had standing because they claimed that the federal defendants had denied them equal protection. *Id.*, at 571. With respect to the second suit, the court found that the State had standing because it alleged "a judicially cognizable interest in the preservation of its own sovereignty, and a diminishment of that sovereignty by the alleged interference in its employment relations with its public employees." *Id.*, at 567. While appellants suggest in this Court that none of the plaintiffs in the lawsuit brought by the public agencies were properly before the District Court, they concede, and we agree, that there is no question concerning the State's standing to bring the action. Therefore, the District Court plainly had authority to resolve this controversy, as do we.

vision, and Congress derived no authority from § 1304[18] to amend the § 418 Agreement, as opposed to § 418.

The contractual right to withdraw, reasoned the District Court, constituted "private property" within the meaning of the Just Compensation Clause of the Fifth Amendment. Amended § 418(g) effected a taking of that property without providing the requisite just compensation. In the court's view, the "only rational compensation would be reimbursement by the United States to the State or public agencies, of the amount of money they currently pay to the United States for their participation" in the Social Security Program. 613 F. Supp., at 575. Since amended § 418(g) was enacted to solve the Social Security "financial crisis," however, the District Court concluded that an order awarding this measure of damages would be "simply and clearly contrary to the will of Congress." . *Ibid.* Accordingly, the District Court simply declared § 418(g) unconstitutional. *Ibid.* We noted probable jurisdiction, 474 U. S. 1004 (1985), and now reverse.

## II

### A

Congress' decision that American workers need a federal program of social insurance protecting them in old age and disability "has of necessity called forth a highly complicated and interrelated statutory structure." *Flemming* v. *Nestor,* 363 U. S. 603, 610 (1960). Since the Act was designed to protect future, as well as present, generations of workers, it was inevitable that amendment of its provisions would be necessary in response to evolving social and economic conditions unforeseeable in 1935. *Ibid.* Congress anticipated that it would be necessary to respond to "ever-changing conditions" with "flexibility and boldness," *ibid.,* and therefore included in the Act "a clause expressly reserving to it '[t]he

---

[18] Title 42 U. S. C. § 1304 provides: "The right to alter, amend, or repeal any provision of this chapter is hereby reserved to the Congress."

right to alter, amend, or repeal any provision' of the Act. § 1104, 49 Stat. 648, 42 U. S. C. § 1304. That provision makes express what is implicit in the institutional needs of the program." *Id.*, at 611. As appellees must concede, the Act itself, including the original version of § 418(g), created no contractual rights. Cf. *Flemming* v. *Nestor, supra,* at 608–611; see also *National Railroad Passenger Corporation* v. *Atchison, T & S. F. R. Co.*, 470 U. S. 451, 465–470 (1985). Therefore, there is no doubt that Congress had the power to amend the section.

In view of the purpose and structure of the Act, and of Congress' express reservation of authority to alter its provisions, courts should be extremely reluctant to construe § 418 Agreements in a manner that forecloses Congress' exercise of that authority. While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights, see *Perry* v. *United States,* 294 U. S. 330, 350–354 (1935); *Lynch* v. *United States,* 292 U. S. 571 (1934), we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract. *Merrion* v. *Jicarilla Apache Tribe,* 455 U. S. 130, 148 (1982). Rather, we have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Ibid.* Therefore, contractual arrangements, including those to which a sovereign itself is party, "remain subject to subsequent legislation" by the sovereign. *Id.*, at 147.

These principles form the backdrop against which we must consider the District Court's decision effectively to forbid Congress to amend a provision of the Social Security Act. That decision heeded none of this Court's often-repeated admonitions that contracts should be construed, if possible,

to avoid foreclosing exercise of sovereign authority. Those admonitions take on added force when the arrangement pursuant to which the Government is claimed to have surrendered a sovereign power is one that serves to implement a comprehensive social welfare program affecting millions of individuals throughout our Nation.

## B

Venerable precedent supports our conclusion that Congress reserved the authority to amend not only § 418 but also Agreements entered into "in conformity with" that section. Just last Term, we considered a statute in which Congress had " 'expressly reserved' its right to 'repeal, alter, or amend' the Act at any time," *National Railroad Passenger Corporation, supra,* at 456, and we noted that the "effect of these few simple words" has been settled since the *Sinking-Fund Cases,* 99 U. S. 700 (1879). 470 U. S., at 467–468, n. 22. The *Sinking-Fund Cases* involved federal statutes that governed railroads' obligations to the United States on subsidy bonds. The statutes in question expressly reserved Congress' authority to repeal, alter, or amend them, and Congress exercised that power by requiring the railroads to set aside part of their current income as a sinking fund to meet their debts to the Government as those debts came due. The railroads claimed that this amendment deprived them of property without due process and improperly interfered with their vested rights. 99 U. S., at 719. In rejecting those arguments, the Court explained that through the language of reservation, "Congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments as come within the just scope of legislative power." *Id.,* at 720. The effect of the Court's construction of the reservation was to authorize Congress not only to amend the statute granting the railroads' corporate charter but also to change the stipulations of a contract made under that charter subsequently to and

independently of the original statute. Whatever the limits of the reserved power, it was "safe to say" that Congress had the authority to provide by amendment whatever rules it might "have prescribed in the original charter" and terms governing the "performance of contracts already entered into." *Id.*, at 721.

This reasoning disposes of appellees' contention that Congress lacked authority to amend California's § 418 Agreement. The State accepted the Agreement under an Act that contained the language of reservation. That language expressly notified the State that Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself.[19] We have no doubt that in 1950 Congress could have provided that States electing to enter the Social Security System would not have authority to terminate their participation. Therefore, amended § 418(g) falls well within the limits of Congress' reserved power to alter the law governing performance of § 418 Agreements.

## C

The § 418 Agreement provided that its terms were "in conformity with" § 418. Therefore, the Agreement expressly incorporated § 418, which of course was fully subject to Congress' reserved power of amendment. Appellees nonetheless insist that the termination provision embodied in the

---

[19] The language of § 418 and of California's § 418 Agreement provides further support for this conclusion. Section 418(a)(1) requires that the provisions of § 418 Agreements be "not inconsistent with the provisions of this section," 42 U. S. C. § 418(a)(1) (1982 ed., Supp. II), and the Agreement provided that it was "in conformity with" § 418. The State was thus on notice that the terms of its Agreement must mirror the provisions of the section, which could be amended under the reserved power. If Congress amended § 418 in such a manner as to render a provision of an Agreement "inconsistent" or no longer "in conformity" with the section, then the logical conclusion is that the inconsistent provision no longer was to be given legal effect.

Agreement constituted a valuable property right that was "taken" when Congress enacted amended §418(g). In the *Sinking-Fund Cases,* the Court did observe that Congress' exercise of the reserved power "has a limit" in that Congress could not rely on that power to "take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made." 99 U. S., at 720. Similarly, other decisions have held that Congress does not have the power to repudiate its own debts, which constitute "property" to the lender, simply in order to save money. *Perry* v. *United States,* 294 U. S., at 350–351; see *Lynch* v. *United States,* 292 U. S., at 576–577.

But the "contractual right" at issue in this case bears little, if any, resemblance to rights held to constitute "property" within the meaning of the Fifth Amendment. The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in §418 itself. The provision constituted neither a debt of the United States, see *Perry* v. *United States, supra,* nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, see *Lynch* v. *United States, supra.* The termination clause was not unique to this Agreement; nor was it a term over which the State had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare. Under these circumstances, we conclude that the termination provision in California's §418 Agreement did not rise to the level of "property." The provision simply cannot be viewed as conferring any sort of "vested right" in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation. Since appellees had no property right in

the termination clause, amended § 418 did not effect a taking within the meaning of the Fifth Amendment.

## III

The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this decision.

*It is so ordered.*