**WESTERN ENERGY COMPANY, Plaintiff–Appellant,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR, et al., Defendants–Appellees.**

No. 90–35356.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1991.

Decided May 8, 1991.

---

James A. Poore, III, Poore, Roth & Robinson, Butte, Mont., for plaintiff-appellant.

Evelyn S. Ying, Appellate Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Before WIGGINS, BRUNETTI and NELSON, Circuit Judges.

THOMAS G. NELSON, Circuit Judge:

In this appeal from a judgment of the district court upholding the Secretary of the Interior's amendments to Western Energy Company's coal lease, we hold that the 1976 amendments to the Mineral Lands Leasing Act of 1920 apply to leases issued prior to 1976. In doing so, we join with the courts of appeals for the District of Columbia Circuit and the Tenth Circuit.

## I. BACKGROUND

The Tenth and D.C. Circuits have decided four cases on the issues related to the effect of the 1976 amendment to the Mineral Lands Leasing Act (MLLA).[1] Since we basically agree with the conclusions of the courts in those cases, it is not necessary to unduly burden the libraries of the country with extensive independent discussion of the issues.

The background of the legislation involved in these cases has been explained by the D.C. Circuit in *Western Fuels–Utah:*

> The Mineral Lands Leasing Act of 1920 ("MLLA"), 41 Stat. 437 (1920) (codified as amended at 30 U.S.C. §§ 181–287), authorized the Secretary of the Interior to lease federal lands for coal production. The Act dictated certain mandatory provisions to be included in the leases it authorized; in particular, it required that each lease provide for payment by the lessee of a royalty of not less than five cents per ton of coal extracted. § 7, 41 Stat. at 439. The Act provided that the term of a coal mining lease would be indeterminate, upon condition of diligent development and continued operation of the mine, and upon the further condition that "at the end of each twenty-year period succeeding the date of the lease

---

1. *Western Fuels–Utah v. Lujan,* 895 F.2d 780 (D.C.Cir.1990); *FMC Wyoming Corp. v. Hodel,* 816 F.2d 496 (10th Cir.1987); *Coastal States* *Energy Co. v. Hodel,* 816 F.2d 502 (10th Cir. 1987); *Trapper Mining Inc. v. Lujan,* 923 F.2d 774 (10th Cir.1991).

such readjustment of terms and conditions may be made as the Secretary of the Interior may determine, unless otherwise provided by law at the time of the expiration of such periods." *Id.*

In 1976, Congress enacted the Federal Coal Leasing Amendments Act of 1976, 90 Stat. 1083 (1976) (codified as amended at scattered sections of 30 U.S.C.). Among the several concerns that led Congress to amend the MLLA was the low royalty lessees were paying for publicly owned coal. *See* H.R.Rep. No. 681, 94th Cong., 2d Sess. 17, *reprinted in* 1976 U.S.Code Cong. & Admin.News 1943, 1953 [hereinafter 1976 House Report] ("the public is being paid a pittance for its coal resources"). Accordingly, Congress amended § 7 of the MLLA, 30 U.S.C. § 207, to provide:

> A coal lease shall be for a term of twenty years and for so long thereafter as coal is produced annually in commercial quantities from that lease.... A lease shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12 per centum of the value of coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations. The lease shall include such other terms and conditions as the Secretary shall determine. Such rentals and royalties and other terms and conditions of the lease will be subject to readjustment at the end of its primary term of twenty years and at the end of each ten-year period thereafter if the lease is extended.

895 F.2d at 782 (emphasis in original).

Appellant Western Energy Company (Western) is a wholly owned subsidiary of the Montana Power Company and the holder of the 1966 lease at issue. The lease contains the following language:

> Sec. 3. The lessor expressly reserves:
>
> \* \* \* \* \* \*
>
> (d). *Readjustment of Terms*
>
> The right reasonably to readjust and fix royalties payable hereunder and other

terms and conditions at the end of twenty years from the date hereof ... unless otherwise provided by law at the expiration of any such period....

Approximately two years before the end of the initial twenty-year period, the Bureau of Land Management (BLM) of the Department of the Interior gave notice to Western that it intended to readjust the lease terms and conditions. At Western's request, representatives of BLM met with representatives of Western to discuss the terms of the readjustment. Consistent with the other cases cited here, BLM took the position that the 1976 amendments required that existing leases be readjusted to meet the Federal Coal Leasing Amendments Act's (FCLAA) minimum terms. Western received a readjusted lease which, among other things, increased the royalty rate of 20 per ton to 12.5 percent of the value of the coal mined and shortened the readjustment period from successive twenty-year periods to ten years. Western timely pursued its administrative remedies through the Department of Interior and was unsuccessful. Western filed a timely action in the district court pursuant to 28 U.S.C. § 1331 and here challenges the district court's decision upholding the Secretary's readjustment of the terms of the lease. This court has jurisdiction under 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

■ This court reviews *de novo* the district court's grant of summary judgment. *Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1439 (9th Cir.1990). Western seeks review of the Secretary of Interior's readjustment decision pursuant to 5 U.S.C. § 706(2)(A). This court will not overturn such an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or contrary to law." *Norfolk Energy*, 898 F.2d at 1439. We review Western's claims that its constitutional rights were violated *de novo. United States v. Savinovich*, 845 F.2d 834 (9th Cir.1988), *cert. denied*, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988).

## III. THE 1920 ACT

Western's challenge to the readjustment of the terms of its lease is quite similar, but not identical, to the challenges of the leaseholders considered in the previously cited decisions of the other circuits. Western has approached the interpretation issue in the reverse order from that advanced in the other courts, where the courts first reached the issue of the intent of the Congress in enacting the 1976 FCLAA amendments to MLLA. However, the parties in those cases did advance the basic proposition which Western espouses here: that the intent of Congress in 1920 controls. The *Western Fuels–Utah* court disposed of the contention as follows:

> The appellants also argue that the 1976 FCLAA must be read in light of the history of federal coal leasing since 1920, and that the 1976 Congress must be presumed not to have intended to change the scheme of long-term lease stability created by the 1920 Congress. The 1920 Congress, appellants argue, knew that coal mining requires large capital expenditures that a mining company would not be willing to make if it could obtain fixed lease terms for only twenty years, and so it created the indeterminate lease. However, even assuming, without deciding, that the 1976 Congress did not intend to break promises of stability made by the 1920 Congress, we find no evidence that the 1920 Congress made any promise that would preclude a later Congress from regulating the royalty for coal leases.
>
> The 1920 MLLA provided that "at the end of each twenty-year period succeeding the date of [a coal] lease such readjustment of terms and conditions may be made as the Secretary of the Interior may determine, unless otherwise provided by law at the time of the expiration of such periods." 41 Stat. at 439. The Act put no upper limit on the royalty rate the Secretary might set upon readjustment; hence, even without FCLAA the Secretary would have had the power (though not the obligation) to fix a rate of 12.5%. It is clear, therefore, that Congress nev-

> er promised that coal lessees would not be subject to such a rate.
>
> The appellants argue, however, that although under the 1920 Act the Secretary could choose such a rate, a subsequent Congress could not direct the Secretary's choice by law. Drawing on excerpts from the legislative history of the 1920 Act, the appellants claim that Congress decided permanently to lodge the authority to readjust royalty rates in the Secretary. The history cited by the appellants, however, shows no more than that Congress, in 1920, was faced with the ordinary choice between dictating certain rates by statute and leaving them to the discretion of an administrative official. Congress delegated authority, within certain limits, to the Secretary, but retained, as usual, the power to circumscribe the Secretary's authority further at a later date. This is made doubly clear by the express provision in the 1920 Act that readjustments shall be as the Secretary may determine "unless otherwise provided by law," which brings us back full circle to the initial inquiry of what, if anything, the current law does provide as to pre–1976 leases.

895 F.2d at 786–787 (footnotes omitted).

We agree with the analysis of the *Western Fuels–Utah* court that the MLLA did no more than represent the choice of Congress to leave the establishment of the royalty rates to administrative action rather than Congressional mandate. We reject Western's argument that the MLLA was a considered decision by Congress to limit its discretion in the future to change the Secretary's authority over the terms of the leases.

Western brings to our attention the case of *Lau Ow Bew v. U.S.*, 144 U.S. 47, 12 S.Ct. 517, 36 L.Ed. 340 (1892), in support of this proposition. Apparently, this case was not cited to the other circuits by the parties in those cases, or if it was cited, it was not mentioned in the decisions.

In *Lau Ow Bew*, the Supreme Court was interpreting the provisions of the Evarts Act, 26 Stat. 826 (1891) which established the United States courts of appeals. Sec-

tion 5 of that Act provided that appeals or writs of error could be taken from the federal trial courts directly to the Supreme Court in six specified classes of cases. In the next section, the Act provided that the courts of appeals "shall exercise appellate jurisdiction to review, by appeal or by writ of error, final decisions of the [district] courts in all cases other than those provided for in the preceding section of this Act, unless otherwise provided by law." Western points out that the Supreme Court gave a limited interpretation of the phrase "unless otherwise provided by law":

> The words "unless otherwise provided by law" were manifestly inserted out of abundant caution, in order that any qualification of the jurisdiction by contemporaneous or subsequent acts should not be construed as taking it away except when explicitly so provided. Implied repeals were intended to be thereby guarded against.

*Id.* at 519.

Western argues that this interpretation of the phrase "unless otherwise provided by law" was the operative interpretation by the Supreme Court of the United States in 1920 when the MLLA was adopted and therefore should be read into those words when used in the MLLA.

Western is stretching the *Lau Ow Bew* case much further than is warranted. The existence and jurisdiction of courts inferior to the Supreme Court under Article III of the Constitution rests entirely within the discretion of Congress. As the Supreme Court noted in *Lau Ow Bew*, the effect of the Evarts Act was to distribute the entire appellate jurisdiction of the federal courts not vested in the Supreme Court.

Since Congress can, and does, deal with federal court jurisdiction in a variety of settings, Congress intended to guard against implied repeals of portions of the Evarts Act, which could then create gaps in the system of appellate jurisdiction contemplated by the Act. In contrast, there is no such need for concern by Congress for implied repeals of particular provisions of the MLLA, dealing as it does with specific authority of the Secretary to lease mineral lands, which appears to have little exposure to implied repeal. In addition, there is nothing implied in Congress' amendments to the MLLA at issue here. Congress was quite explicit in its actions, unlike the concern voiced in *Lau Ow Bew*.

Equally unpersuasive is Western's comparison to *Owensboro v. Cumberland Telephone Co.*, 230 U.S. 58, 33 S.Ct. 988, 57 L.Ed. 1389 (1913). There, a city had attempted to repeal the perpetual easement granted for the placement of telephone lines within the city. Owensboro then wanted to sell the divested rights back to the utility company. The Supreme Court struck down the ordinance because the city charter had expressly limited city action to regulatory police power and it was then attempting to destroy a perpetual grant under the guise of the police power simply to make money. The fact that there was no regulatory purpose was evidenced by the disingenuous attempt to sell the easement back to the utility.

Here, however, the government is modifying the coal lease pursuant to the terms of the original contract because Congress determined that the United States was not being adequately compensated for minerals extracted from its land. The MLLA expressly allowed modification at predetermined intervals.

## IV. THE 1976 ACT

Western argues that Congress did not, in amending the MLLA by the adoption of FCLAA in 1976, intend to extend the royalty requirements of FCLAA to pre–1976 leases. The *Western Fuels–Utah* court reviewed the statute and its legislative history and determined that the intent of Congress was that the 1976 amendment apply to pre–1976 leases. *See* 895 F.2d at 783. It is sufficient here to say that both the analysis and the conclusion are convincing and this court holds that the 1976 amendments to the MLLA did apply to pre–1976 leases such as Western's.

As a further consequence of our interpretation, Western's comparison to the fixed terms created by the Federal Water Power Act, 16 U.S.C. §§ 791a–825r (1978),

the oil and gas provisions of the MLLA and the sodium lease amendments, is erroneous. Even if the indeterminate nature of the lease was significant in 1920, it is the intent of the 1976 Congress that controls.

## V. THE CONSTITUTIONALITY OF THE LEASE ADJUSTMENTS

Western contends that its lease was a contract entered into pursuant to the clear authority of Congress, citing *Perry v. U.S.*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935), and *Lynch v. U.S.*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1935). To accept Western's premise that its lease with the United States is a species of property protected by the fifth amendment is not to agree that its analysis is correct. The contract interest at issue in *Lynch* (term insurance issued during the first world war) and in *Perry* (United States bonds payable in gold) are quite different from the lease interest acquired by Western under the terms of the MLLA. In *Lynch*, even though the act of Congress authorizing the issuance of the insurance had provided that the policies would be subject to all amendments to the original act, the court noted that the insurance had been issued prior to the repeal of the authorizing legislation and therefore the repeal would abrogate outstanding contracts without compensation. In *Perry*, the form of bond which had been purchased by the bond holder on its face was payable in gold coin "of the present standard of value." The court held that the authority of Congress to establish a monetary system did not authorize it to invalidate terms of obligations issued in the exercise of the power to borrow money.

As we have pointed out in part II of this opinion, Congress did not intend by adopting MLLA, to place the authority of the Secretary over the terms and conditions of the lease entirely beyond subsequent Congressional amendment. Western took its lease subject to this authority of Congress. The interpretation urged by Western would have the effect of placing the leases issued pursuant to the MLLA beyond the scope of Congressional regulatory power. In this regard, Western's situation is perhaps most closely analogized to the case of *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986).

In *Bowen*, Congress had allowed participation in the social security system by states and local units of government, if they chose to enter the system. The amendment authorizing such voluntary participation allowed states to terminate their voluntary agreements upon giving at least a two-year advance notice to the Secretary. In 1983, Congress amended the Social Security Act to provide that states and local units of government could no longer terminate their participation in the program. At the time of the amendment which prohibited termination, California had already filed termination notices on behalf of seventy-one political subdivisions. The Supreme Court noted that the Social Security Act, as originally adopted, and as continued in effect through various amendments, specifically provided that Congress could "alter, amend or repeal any provision" of the Act. The California agencies argued that the particular amendment to the Social Security Act which prohibited voluntary withdrawal had deprived the agencies of their contract rights without compensation, in violation of the fifth amendment. The Supreme Court said:

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights and concomitant duty to honor those rights, see [*Perry* and *Lynch* ], we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract.... Rather, we have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms."

477 U.S. at 52, 106 S.Ct. at 2397 (citations omitted).

In considering readjustment clauses substantially identical to that in the lease before us, the *Western Fuels* court said:

> Applying this rule of construction to the lease contracts before us, we conclude that the leases reserve to Congress the power to provide by law for a specific readjustment. The phrase "unless otherwise provided by law at the time of the expiration of any such period," though susceptible of multiple interpretations, is certainly susceptible of this one, which has the indisputable advantage of not foreclosing the exercise of sovereign authority. The leases here do not represent a surrender "in unmistakable terms" of Congress' power to change the law of federal coal leasing. Accordingly, we find that the pre–1976 leases did not give the lessees a vested right to reasonable readjustments by the Secretary on an individualized basis indefinitely into the future. A congressionally-mandated readjustment at the end of a twenty-year period therefore does not represent a taking of property in violation of the Takings Clause.

895 F.2d at 789 (footnote omitted).

This analysis, we believe, is appropriate. Western's lease was issued pursuant to the authority of the 1920 Act, which specifically contemplated the possibility that Congress might amend the authority of the Secretary. In that setting, the lease itself should not operate to tie the hands of Congress to exercise the authority which it had reserved.

## VI. CONCLUSION

For the reasons stated, we find no error in the Department of Interior's adjustments of the terms of Western's lease. The judgment of the district court is AFFIRMED.