WOODSTOCK ASSOCIATES, t/a Valley Vista Apartments, Plaintiff,

v.

Jack KEMP, Secretary, United States Department of Housing and Urban Development, Defendant.

Civ. A. No. 91–0957–A.

United States District Court, E.D. Virginia, Alexandria Division.

June 23, 1992.

Barbara P. Beach, Beach, Butt & Associates, P.C., Alexandria, Va., for Woodstock Associates T/A Valley Vista Apartment.

Dennis E. Szybala, Asst. U.S. Atty., Alexandria, Va., for Secretary of HUD, Jack Kemp.

Nancy J. Glickman, Blue Ridge Legal Services, Inc., Winchester, Va., for Tenants at Valley Vista Apt. (amicus curiae brief).

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This case, as originally filed, presented the question whether in the circumstances the United States Department of Housing and Urban Development ("HUD") was empowered to renew Woodstock Associates' ("Woodstock's") expiring Housing Assistance Payments ("HAP") contract automatically for five years, even though Woodstock desired to end the contractual rela-

tionship. Imbedded in this question were a number of issues suitable for summary judgment concerning the interpretation of the lower-income housing assistance statute. *See* 42 U.S.C. § 1437f. As it happened, the Court never reached these issues, for during the pendency of the action, the parties reached a settlement agreement whereby they agreed to execute a two-year HAP contract, rather than the five-year automatic renewal contract. Yet this did not end the matter, as HUD thereafter repudiated the settlement, arguing that it lacked the authority to enter into the agreement. Woodstock disagreed and filed a motion to enforce the settlement, which, together with the parties' cross-motions for summary judgment, are now before the Court for disposition. For the reasons set forth below, the Court concludes that HUD has the authority to enter into a two-year HAP contract with Woodstock and accordingly enforces the parties' settlement agreement. This result moots the parties' cross-motions for summary judgment.

### Facts

This case involves a so-called Section 8 contract. Under the Section 8 Loan Management Set–Aside Program, HUD contracts directly with owners of existing, new, or rehabilitated HUD-insured housing units for the payment of the difference between the contract rent, not to exceed the fair market rent for the dwelling, and a specified percentage of the tenant's gross income. Eligible tenants pay the highest of either (i) thirty percent of adjusted income, (ii) ten percent of gross income, or (iii) the portion of welfare assistance designated to meet housing costs. Section 8 subsidies paid directly to project owners experiencing financial difficulty provide cash flow so that owners can avoid foreclosure and a claim on the insurance fund. *See* 42 U.S.C. § 1437f(b). In this case, project owner Woodstock entered into a Section 8 HAP contract with HUD in September 1976. At that time, the law required that HAP contracts be limited to an initial term of five years with two renewable five-year terms. Thus, in September 1981, and again in September 1986, Woodstock renewed its HAP contract with HUD. As the September 1986 contract represented the parties' final five-year renewal term, it explicitly stated that "[t]his [c]ontract may be renewed for 0 [zero] additional five-year periods at the option of the Owner and HUD."

Subsequent to the parties' 1986 HAP renewal contract, Congress amended the lower-income housing assistance statute, § 1437f. *See* Housing and Community Development Act of 1987, otherwise known as the Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100–242, 101 Stat. 1815 (1988) [hereinafter 1987 Act]. The two 1987 amendments here in issue are: (i) section 262(a), which requires an owner, prior to terminating a HAP contract, to provide one-year's written notice to HUD and the affected tenants, *see* 42 U.S.C. § 1437f(c)(9),[1] and (ii) section 262(c), which requires HUD to extend an expiring

---

1. 42 U.S.C. § 1437f(c)(9) states:

 Not less that 1 year prior to terminating any contract under which assistance payments are received under this section (but not less than 90 days in the case of housing certificates or vouchers under subsection (b) or (*o*) of this section), an owner shall provide written notice to the Secretary and the tenants involved of the proposed termination, specifying the reasons for the termination with sufficient detail to enable the Secretary to evaluate whether the termination is lawful and whether there are additional actions that can be taken by the Secretary to avoid the termination. The owner's notice shall include a statement that the owner and the Secretary may agree to a renewal of the contract, thus avoiding the termination. The Secretary shall review the owner's notice, shall consider whether there are additional actions that can be taken by the Secretary to avoid the termination, and shall ensure a proper adjustment of the contract rents for the project in conformity with the requirements of paragraph (2). The Secretary shall issue a written finding of the legality of the termination and the reasons for the termination, including the actions considered or taken to avoid the termination. Within 30 days of the Secretary's finding, the owner shall provide written notice to each tenant of the Secretary's decision. For purposes of this paragraph, the term "termination" means the expiration of the assistance contract or an owner's refusal to renew the assistance contract.

HAP contract or to execute a new contract if the owner agrees to continue providing low-income housing, *see* 42 U.S.C. § 1437f(v)(1).[2] Congress enacted these provisions fearing the potential loss of more than 465,000 low-income housing units as a result of the expiration of Section 8 contracts. It appears Congress was concerned that loss of this privately-owned and federally-assisted housing in a period of sharply rising rents and falling low-rent housing production would inflict unacceptable harm on current tenants and precipitate a national crisis in the supply of low-income housing. H.R.Conf.Rep. No. 426, 100th Cong., 1st Sess. 192, *reprinted in* 1987 U.S.Code Cong. & Admin.News 3317, 3458, 3489.[3]

Following these statutory amendments, HUD circulated a memorandum in July 1988 setting forth the procedure to be followed with respect to the one-year written termination notice requirement. A second HUD memorandum was promulgated in June 1989 reemphasizing the one-year notice requirement and instructing HUD officials to notify all project owners with HAP contracts expiring between October 1, 1988, and February 5, 1990, of the possibility of obtaining a two-year contract extension if they gave the required notice.

HUD's offer of a two-year extension term was short-lived. It was extinguished when the June 1989 memorandum was superseded by a July 1990 HUD memorandum stating that owners with HAP contracts expiring in fiscal year 1990 could be offered only five-year extensions rather than two-year contracts because of the 1990 Appropriations Act,[4] which declared that federal funds could not be obligated for Section 8 contract terms of less than five years. This five year requirement also appeared in the 1991 Appropriations Act.[5] Thus, HUD Notice 91–60, circulated in July 1991, retained the five-year renewal term for owners with HAP contracts expiring in fiscal year 1991 who had given the required one-year's written notice of contract termination. Significantly, HUD Notice 91–60 also stated that an owner's failure to give the one-year written notice to HUD and the affected tenants would result in an *automatic* five-year contract extension.[6] Neither this memorandum, nor any prior HUD memoranda implementing the notice and renewal provisions of the 1987 Act, ever appeared in the Federal Register. Surprisingly, the 1991 Code of Federal Regulations contains only those regulations that existed prior to the 1987 Act.[7]

**2.** 42 U.S.C. § 1437f(v)(1) states that "the Secretary shall extend any expiring contract entered into under this section for loan management assistance or execute a new contract for project-based loan management assistance, if the owner agrees to continue providing housing for low-income families during the term of the contract."

**3.** Section 202(b) of the 1987 Act sets forth the Act's specific purpose as follows:

It is the purpose of this title (1) to preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately-owned dwelling units that were produced for such purpose with federal assistance; (2) to minimize the involuntary displacement of tenants currently residing in such housing; and (3) to continue the partnership between all levels of government and the private sector in the production and operation of housing that is affordable to low-income Americans.

1987 Act, Pub.L. No. 100–242, 101 Stat. 1815 (1988).

**4.** Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1990, Pub.L. No. 101–144, 103 Stat. 839 (1989).

**5.** Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1991, Pub.L. No. 101–507, 104 Stat. 1351, 1357 1361 (1990).

**6.** Prior to this, HUD memoranda provided that owners of projects with expiring HAP contracts who do not give one-year's written notice of contract termination may be subject to litigation to compel compliance with the 1987 Housing Act. *See* HUD memorandum, "Administrative Instructions for Extension of Expiring Section 8 LMSA Contracts", June 28, 1989 [hereinafter 1989 HUD memorandum].

**7.** 24 C.F.R. § 886.111 (1991) states that "[a HAP] [c]ontract may be for an initial term of not more than 5 years, renewable for successive 5 year terms by agreement between HUD and the Owner: *Provided,* That the total Contract term, including renewals, shall not exceed 15 years." The C.F.R. also incorrectly states that "the owner will notify each assisted family, at least 90 days before the end of the [c]ontract term...." 24 C.F.R. § 886.111a(a) (1991).

Woodstock's fifteen-year HAP contract was due to expire on September 15, 1991. Having decided that it did not wish to renew the contract, Woodstock, in February 1991, sent HUD a written notice of non-renewal and orally notified the affected tenants. Following this, Woodstock sent HUD a two-year renewal contract, stating that this extension conformed to the June 1989 HUD memorandum. HUD responded by advising Woodstock that HUD's 1990 and 1991 memoranda had superseded the 1989 memorandum and that five-year contract extensions were now required. HUD also informed Woodstock that because its February 1991 notice of non-renewal came less than one year prior to contract termination, Woodstock's HAP contract would be automatically extended for five years.[8] Woodstock then filed this declaratory judgment action, asking this Court to declare that (i) its HAP contract with HUD expired on September 15, 1991; (ii) HUD could not automatically renew the contract for five years; (iii) § 1437f(v)(1) requires HUD to obtain an owner's agreement before extending an expiring HAP contract; and (iv) HUD's 1989 memorandum permits a two-year extension of Woodstock's HAP contract.[9]

While this action was pending, the parties entered into settlement negotiations. Specifically, on November 5, 1991, HUD made a settlement proposal to Woodstock whereby HUD agreed to grant Woodstock a two-year HAP contract. Woodstock accepted this offer. HUD responded by promising to send the paperwork necessary to consummate the settlement. Instead of doing so, however, HUD faxed a letter to Woodstock withdrawing the settlement offer on the ground that HUD did not have the statutory authority to enter into a two-year HAP contract. HUD contends that at the time of the initial settlement offer, it reasonably believed that the 1992 Appropri-

ations Act[10] would authorize funding for renewals of HAP contracts for periods of less than five years. Thereafter, according to HUD, it learned that the 1992 Appropriations Act authorized less than five-year funding only for "new" HAP contracts. For HAP contract "renewals", the 1992 Appropriations Act authorized funding only for contract periods of five years or more. In HUD's view, Woodstock's HAP contract is a "renewal" rather than a "new" contract because it was "automatically extended", pursuant to HUD Notice 91–60, when Woodstock failed to provide the required one-year written contract termination notice. Based on this, HUD concludes that it does not have the statutory authority under the 1992 Appropriations Act to obligate federal funds for a HAP contract with Woodstock for less than five years. Moreover, HUD concludes that even if the settlement agreement could somehow be considered a "new" HAP contract, it could not be awarded to Woodstock without first putting the contract out for competitive bidding. *See* 42 U.S.C. § 1439(d)(5)(A). Woodstock disagrees, arguing that HUD lacked the statutory authority to renew its HAP contract automatically for five years. Therefore, Woodstock concludes its HAP contract expired on September 15, 1991, and the settlement agreement represents a "new" two-year contract for which HUD has the authority to obligate funds without putting the contract out for competitive bidding. *See* 42 U.S.C. § 1439(d)(4)(A)(iii), (d)(5)(D).

### Analysis

 It is well-settled that agreements between the government and private parties are enforceable provided the agent "who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10

---

**8.** HUD sent a second letter to this effect on September 17, 1991.

**9.** As there were no material facts in dispute, the parties subsequently filed cross-motions for summary judgment.

**10.** Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1992, Pub.L. No. 102–139, Title II, 105 Stat. 736 (1991).

(1947).[11] Here, the parties dispute the government's authority. Both parties, however, incorrectly frame the issue of the government's settlement authority as depending upon resolution of the underlying summary judgment issue, namely, whether Woodstock's HAP contract could be automatically extended for five years when Woodstock failed to give the required one-year written notice of contract termination. Framing the issue in this way overlooks the fact that the purpose of HUD's settlement offer was to resolve the case without having to resolve the underlying legal dispute. Thus, the appropriate threshold question is not whether HUD's current automatic renewal policy is valid, but rather whether HUD had the authority to settle this case. If so, the settlement offer, which Woodstock accepted, should be enforced, thereby ending this matter and making it unnecessary for the Court to reach the summary judgment issues.

■■■ Congress has given HUD the authority to settle lawsuits involving housing assistance contracts. *See* 42 U.S.C. § 1439(d)(4)(A).[12] This provision authorizes the HUD Secretary to retain up to five percent of the financial assistance that becomes available [in fiscal year 1992] under programs described in § 1437 *et seq.* to pay for, among other things, "housing needs resulting from the settlement of litigation" [in fiscal year 1992]. *See* 42 U.S.C.

§ 1439(d)(4)(A)(iii). This statute, applied here, plainly authorizes HUD to settle with Woodstock and to fund the settlement agreement. First, the two-year HAP contract offered by HUD in settlement clearly relates to the housing needs of Woodstock's tenants. It allows the tenants to remain in their subsidized apartments for two additional years rather than forcing them to find other housing on short notice should HUD lose the litigation.[13] Second, HUD's suggestion that it is "unaware of the availability" of money to fund the settlement agreement[14] is immaterial; it does not impair HUD's authority to enter into the settlement agreement. The statute explicitly authorizes HUD to retain money to fund settlement agreements when it exercises its discretionary authority to offer settlement. Discretionary power to offer settlement, however, does not give HUD the authority to withdraw an offer when it fails to set aside the necessary money. Where, as here, HUD exercises its discretionary authority to offer settlement, it must then set aside the money to fund the agreement in accordance with the statute. *See* 42 U.S.C. § 1439(d)(4)(A).

HUD also expresses concern that it does not have the authority to grant Woodstock a two-year HAP contract in settlement of this case without first putting the contract out for competitive bidding pursuant to 42 U.S.C. § 1439(d)(5)(A).[15] This concern is

**11.** No agency issue is presented here. The parties do not dispute whether the Assistant United States Attorney for the Department of Justice was a HUD agent authorized to make the settlement offer. Rather, they dispute whether HUD had the authority to offer a two-year HAP contract in settlement of this case.

**12.** Section 1439(d)(4)(A) states in pertinent part: Notwithstanding any other provision of law, with respect to fiscal years beginning after September 30, 1990, the Secretary may retain not more than 5 percent of the financial assistance that becomes available under programs described in subsection (a)(1) of this section during any fiscal year. Any such financial assistance that is retained shall be available for subsequent allocation to specific areas and communities, and may only be used for ... (iii) housing needs resulting from the settlement of litigation.

**13.** The tenants would be forced to find other housing if the Court were to rule that HUD's

automatic renewal policy is unenforceable against Woodstock.

**14.** This ambiguous statement appears to suggest that, before HUD settled with Woodstock, HUD failed to ensure that the money, which it is authorized to retain under § 1439(d)(4)(A), had in fact been set aside to fund the settlement. It is improbable that the entire amount allocable in fiscal year 1992 for the purposes described in § 1439(d)(4)(A) had been disbursed at the time of the settlement agreement, given that Woodstock accepted the settlement offer only forty-five days after fiscal year 1992 began.

**15.** 42 U.S.C. § 1439(d)(5)(A) requires that HUD "not reserve or obligate assistance subject to allocation under paragraph (1)(A) to specific recipients, unless the assistance is first allocated on the basis of the formula contained in that paragraph and then is reserved and obligated pursuant to a competition."

misplaced; it overlooks a specific statutory exception to the routine competitive bidding process. Section 1439(d)(5)(D) states that contracts obligating funds for "housing needs resulting from the settlement of litigation" need not be subject to competitive bidding. *See* 42 U.S.C. §§ 1439(d)(5)(D),[16] (d)(4)(A)(iii). Congress sensibly recognized that the power to settle would be effectively nullified if it were subject to a competitive bidding requirement.

In essence, then, HUD acted within its authority when it offered a two-year HAP contract in settlement of this case. That contract is a "new" two-year HAP contract formed in fiscal year 1992. It is "new" rather than "renewed" because Woodstock's fifteen-year HAP contract with HUD expired with no renewal terms on September 15, 1991.[17] This expiration requires that the contract be considered "new" even under HUD's own policy guideline, HUD Notice 91–60. Even assuming, *arguendo,* that, pursuant to HUD Notice 91–60, Woodstock's relationship with HUD could have been extended automatically upon the expiration of Woodstock's entire contract, HUD would have automatically sent Woodstock a "new" contract, not a "renewal" contract. *See* HUD Notice 91–60, "Instructions for Section 8 Loan Management Set–Aside Contract Renewals", July 9, 1991 ("Owners who have not given sufficient notice of contract termination must be notified in writing that their contract has been automatically extended for the next five year period, or if their entire contract is expiring, sent a *new* 5–year contract.") (emphasis added). It follows from this that the settlement agreement entered into after Woodstock's entire contract expired also represents a "new" contract rather than a "renewal" contract. And because the "new" contract term was for less than five years, HUD had the authority under the 1992 Appropriations Act to obligate funds for the contract. *See* 1992 Appropriations Act, *supra* note 10 (funds for "new" HAP contract can be obligated for less than five years).

▪ In sum, HUD's settlement offer of a two-year HAP contract was valid and Woodstock's timely acceptance of it created a binding agreement. From this, it follows that the motion to enforce the settlement agreement should be granted. This moots the various summary judgment issues, including (i) whether Woodstock's fifteen-year HAP contract was affected by the subsequently enacted amendments to the Act, namely, § 1437f(c)(9), the one-year termination notice provision, and § 1437f(v)(1), the renewal provision for expiring HAP contracts;[18] and (ii) whether HUD's automatic renewal policy is a permissible construction of the statute.[19] Worth noting

---

**16.** Section 1439(d)(5)(D) states that the competitive bidding process described in subsection (d)(5)(A), *see supra* note 15, shall not apply to assistance referred to in paragraph (4), namely, contracts that obligate funds for housing needs resulting from the settlement of litigation.

**17.** Since that time, Woodstock, HUD, and the affected tenants have been operating in a holdover capacity pending the resolution of this dispute. HUD has continued to send subsidy payments to Woodstock, which Woodstock has accepted. In the related case filed by Woodstock's tenants in the Western District of Virginia, the court there granted the tenants injunctive relief to stay the impending expiration of the contract until that dispute and this related dispute could be resolved.

**18.** It is well-settled that absent a clear waiver by the sovereign of its sovereign power, subsequently enacted statutes amend a contract to which the sovereign is a party. *See Bowen v. Public Agencies Opposed to Social Sec. Entrap-*

*ment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2396, 91 L.Ed.2d 35 (1986) (In the context of a contract between the sovereign and a private party, "'sovereign power, even when unexercised, ... will remain intact unless surrendered in unmistakable terms.'" (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982))). Although not decided here, it seems doubtful that the "zero renewal" provision in the parties' 1986 renewal contract is an explicit waiver by the government of its sovereign power to pass subsequent legislation affecting the contract.

**19.** While the Court need not reach the issue, it notes that the statutory amendments are arguably ambiguous. Section 1437f(c)(9) requires owners to provide HUD and affected tenants with at least one-year's written notice of contract termination. Notably absent, however, is any statement of the consequence for failing to give the requisite notice. Automatic renewal of the contract is not mentioned there. Yet renew-

here, however, is that even assuming HUD's automatic renewal policy is a permissible construction of the statute, the current policy, embodied in HUD Notice 91–60, does not have the force and effect of law because it is an invalidly promulgated substantive rule. An agency pronouncement is considered a substantive rule rather than an interpretive policy statement when the pronouncement (i) operates retroactively or (ii) establishes a "binding norm" by finally determining the issues or rights to which it is addressed. *See Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221, 224 (4th Cir.1981) (citations omitted). HUD's "pronouncement" requiring automatic renewals satisfies both of these factors. It operates retroactively because it was issued July 7, 1991, yet it applies to HAP contracts expiring in fiscal year 1991, which began October 1, 1990. Moreover, HUD Notice 91–60 establishes a "binding norm" by determining that an owner's failure to give one-year's written notice of contract termination results in the contract being extended automatically.[20] Thus, HUD's "pronouncement" requiring automatic renewals is a substantive rule and not an interpretive policy statement. But this substantive rule cannot be given legal effect until it is subjected to the notice and comment procedures of the Administrative Procedures Act ("APA"), 5 U.S.C. § 553(b), (c). *See Rank v. Nimmo*, 677 F.2d 692, 698 (9th Cir.) (For an agency policy to have the " 'force and effect of law' ", [it] must prescribe substantive rules and be promulgated in accordance with the procedural requirements imposed by the APA. (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979))), *cert. denied*, 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982).

An appropriate Order will enter.

### ORDER

For the reasons stated in the Memorandum Opinion issued this day, the Court ORDERS that:

1) Plaintiff's motion to enforce the settlement agreement should be, and hereby is, GRANTED,

2) The parties' cross-motions for summary judgment should be, and hereby are, DENIED AS MOOT.

The Clerk is directed to send copies of this Order to all counsel of record.

---

al of expiring HAP contracts is discussed in § 1437f(v)(1). There, the statute provides that HUD shall extend an expiring HAP contract "if the owner agrees to continue providing housing for low-income families during the term of the contract." § 1437f(v)(1). When read generously together, these statutory sections arguably permit the inference that an owner's silence one-year prior to contract termination may be interpreted as implicit agreement to continue providing low-income housing. This construction of the statute is arguably reasonable given (i) the congressional purpose for the 1987 Act, namely, to preserve and retain to the maximum extent practicable low-income housing, *see also supra* note 3, and (ii) the unexpressed, but apparent congressional intent for the 1987 Act that there be some consequence for an owner's failure to provide one-year's written notice of contract termination.

**20.** HUD only recently took the position that §§ 1437f(c)(9) and (v)(1), enacted in 1987, required automatic renewal of an expiring HAP contract. In 1988, HUD's announced view was that its automatic renewal policy did not apply to expiring contracts for which there were no remaining renewable terms. *See* HUD memorandum, "Notice to Tenants and HUD on Voluntary Terminations (Opt Outs) of Section 8 Contracts and on Expiring Section 8 Contracts", July 6, 1988. And in 1989 and 1990, HUD expressed the view that owners with expiring HAP contracts who had not given one-year's notice of contract termination may be subject to litigation to compel compliance with the 1987 Act. *See* 1989 HUD memorandum, *supra* note 6. Not until 1991 did HUD establish a "binding norm" by determining that an owner's failure to give one-year's notice of contract termination resulted in a "new" contract being issued automatically. *See* HUD Notice 91–60, July 9, 1991.

Not only did the HUD policy change over the years on this issue, HUD also failed to publish any of its policies in the *Federal Register*, even though the 1988 memorandum said HUD expected to have a final regulation pertaining to the 1987 Act published in the *Federal Register* by the middle of 1989. Why this never occurred is unexplained in the record.